UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Bankr. Court Adv. Proc. No. 01-4605** |
| v. | ) | |
| | ) | |
| STATE STREET BANK AND TRUST CO., as | ) | **Related Dist. Court Case: 03-cv-33-KAJ** |
| Indenture Trustee for Junior Subordinated | ) | |
| Secured PIK Notes, | ) | |
| SCOTT CABLE COMMUNICATIONS, INC., | ) | |
| as Debtor in Possession (Chapter 11), | ) | |
| ALLSTATE INSURANCE CO., | ) | |
| MEDIA/COMMUNICATIONS PARTNERS, L.P., | ) | |
| CHESTNUT STREET PARTNERS, INC., | ) | |
| MILK STREET PARTNERS, INC. and | ) | |
| TA INVESTORS, | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF IN SUPPORT OF
UNITED STATES' MOTION THAT DISTRICT COURT
GRANT LEAVE TO APPEAL 4/10/06 ORDER
DENYING MOTION TO TRANSFER VENUE BACK TO
CONNECTICUT IN LIGHT OF RE-ASSIGNMENT OF JUDGE**

PETER SKLAREW
Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Washington, D.C.  20044
(202) 307-6571 / Fax (202) 514-5238
peter.a.sklarew@usdoj.gov

April 20, 2006

**TABLE OF CONTENTS**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Request to Assume Pendent Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Rule 8003(a)(1): Statement of the Facts Necessary to an Understanding
of the Questions to be Presented by the Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    *The 1996 Case – Genesis of the Issue on the Merits* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    *The Pre-Appeal Proceedings in Connecticut in the 1998 Case* . . . . . . . . . . . . . . . . . . . . . 5

    *The Transfer Without a Motion, the Reasons Therefor, and the*
    *First Motion to Re-Transfer* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    *Judge Shiff's Misinterpretation of Judge Walsh's Order Granting the*
    *Debtor's Motion to Intervene, Causing Denial of the Appointment of a*
    *Disinterested Trustee Who May Waive the Debtor's Attorney-Client Privilege* . . . . . . . . . 10

    *Genesis of the Overlapping Delaware and Connecticut Appeals* . . . . . . . . . . . . . . . . . . . . 12

    *Discovery and Summary Judgment Proceedings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    *The Government's 2006 Re-Transfer Motion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    *3/29/06 Bench Ruling; 4/10/06 Order* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    *4/12/06 Rulings on Other Pretrial Motions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Rule 8003(a)(2): Questions to Be Presented by the Appeal and Relief Sought . . . . . . . . . . . . 29

Rule 8003(a)(3): Statement of the Reasons Why Appeal Should be Granted . . . . . . . . . . . . . 30

I.    PREFACE:  CONFLICTING LEGAL STANDARDS FOR DETERMINING
    WHETHER TO GRANT INTERLOCUTORY APPEAL, PARTICULARLY AS
    APPLIED TO VENUE DETERMINATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

II.   INTERLOCUTORY APPEAL IS WARRANTED EVEN UNDER § 1292(b)
    STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    A.  Controlling Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    B.  Substantial Grounds for Difference of Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    C.  Materially Advance the Termination of the Litigation . . . . . . . . . . . . . . . . . . . . . . . . 44

**III.    ADDITIONAL FACTORS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

**Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

**TABLE OF CASES**

Allegheny Health, Educ. & Research Foundation v. Williams, 233 B.R. 671
(Bankr. W.D.Pa. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Bank of America v. Nickele, 1998 WL 181827 (E.D. Pa. 1998) . . . . . . . . . . . . . . . . . . . . . . 39

Bill's Dollar Stores, Inc. v. New Orleans Printing Service, Inc., 200 B.R. 18 (Bankr. Del. 1994) . . . 34

Carteret Sav. Bank, F.A. v. Shushan, 919 F.2d 225 (3rd Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . 39

Clemmons v. Wolfe, 377 F.3d 322 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 37

Codex Corp. v. Milgo Electronic Corp., 553 F.2d 735 (1st Cir. 1977) . . . . . . . . . . . . . . . . . . . . . 7, 36

Colonial Times, Inc. v. Gasch, 509 F.2d 517, 525 (D.C. Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . 48

In re 1606 New Hampshire Ave. Assoc., 85 B.R. 298 (Bankr. E.D.Pa. 1988) . . . . . . . . . . . . . . . . 39

In re Armbrust, 274 B.R. 461 (W.D.Ky 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

In re Continental Airlines, Inc., 133 B.R. 585 (Bankr. Del. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 39

In re Hechinger Inv. Co., 296 B.R. 323 (Bankr. Del. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 26, 39-41

In re Henderson, 197 B.R. 147 (Bankr. N.D. Ala. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

In re Jackson Brook Institute, Inc., 227 B.R. 569 (D.Mass. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 32

In re JLM, Inc., 210 B.R. 19 (B.A.P. 2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

In re Kaiser Group, Int'l, Inc., 307 B.R. 449 (D.Del. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

In re Land, 215 B.R. 398 (8th Cir. BAP 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

In re Landmark Capital Co., 20 B.R. 220 (S.D.N.Y. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

In re Lundborg, 110 B.R. 106 (Bankr. D.Conn. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

In re Manville Forest Products Corp., 896 F.2d 1384 (2nd Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . 39

In re Moix-McNutt, 215 B.R. 405 (B.A.P. 8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

(iii)

In re Nadler, 8 B.R. 330 (Bankr. E.D.Pa. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

In re New York Trap Rock Corp., 158 B.R. 574 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 36

In re Orange Boat Sales, 239 B.R. 471 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

In re Schipper, 933 F.2d 513 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

In re Scott Cable Comm., Inc., 263 B.R. 6 (Bankr. Conn. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

In re Scott Cable Communications, Inc., 227 B.R. 596 (Bankr. Conn. 1998) . . . . . . . . . . . . . . . . . 6, 21

In re Steele Cattle, Inc., 101 B.R. 263 (D.Kan.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

In re Submicron Systems Corp., 432 F.3d 448 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

J.H. Cohn & Co. v. American Appraisal Assoc., Inc., 628 F.2d 994, 997 (7th Cir. 1980) . . . . . . . . 48

Jumara vs. State Farm, 55 F.3rd 873 (3d Cir. 199_) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 39, 40

Mallard v. United States District Court, 490 U.S. 296 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Matter of Trim Lean Meat Products, Inc., 11 B.R. 1010 (D.Del. 1981) . . . . . . . . . . . . . . . . . . . . . . 32

Mishkin v. Ageloff, 220 B.R. 784 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Musken, Inc. v. Strippit, Inc., 158 B.R. 478 (BAP 9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Nascone v. Spudnuts, Inc., 735 F.2d 763 (3d Cir.1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 33, 38, 46

Northern Pipeline Constr. Co. v. Marathon Pipeline Co., 458 U.S. 50 (1982) . . . . . . . . . . . . . . . . . 31

Pacific Car & Foundry Co. v. Pence, 403 F.2d 949 (9th Cir.1968) . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Red Bull Assocs. v. Best Western Int'l, Inc., 862 F.2d 963 (2d Cir.1988) . . . . . . . . . . . . . . . . . . . . . 34

SongByrd, Inv. v. Estate of Grossman, 206 F.3d 172 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

United States v. State St. Bank and Trust Co., 2002 WL 417013 (Bankr. Del. 2002) . . . . . . . . . . . . 10

United States v. State Street Bank & Trust, 303 B.R. 35 (Bankr. Del. 2003) . . . . . . . . . . . . . . . . . . . 16

United States v. State Street Bank and Trust, 232 B.R. 558 (Bankr. Conn. 1999), *rev'd* 259
B.R. 536 (D.Conn. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. State Street Bank and Trust, 259 B.R. 536 (D.Conn. 2001) . . . . . . . . . . . . . . . . . 7, 8

**BRIEF IN SUPPORT OF UNITED STATES' MOTION FOR LEAVE TO
APPEAL ORDER DENYING MOTION TO TRANSFER VENUE BACK
TO CONNECTICUT IN LIGHT OF RE-ASSIGNMENT OF JUDGE**

**Introduction**

The United States of America has filed a motion ["Rule 8003 motion"] seeking leave of the

District Court, pursuant to Bankruptcy Rule 8003, to appeal the order of the Bankruptcy Court dated

April 7 and filed and entered on April 10, 2006 (DI# 410 (Ex.1)) ["4/10/06 Order"], denying the

*United States' Motion to Transfer Venue Back to Connecticut in Light of Reassignment of Judge*

(DI# 331 (Ex.2)), based on a bench decision read during the March 29, 2006 hearing (transcript filed

as DI# 405 (Ex.3)).[1/]  The Rule 8003 motion also requests that the District Court expedite its

determination, and then expedite the appeal if leave is granted.  As the Rule 8003 motion observes, the

United States will also be filing shortly a motion in District Court Civil No. 03-cv-33-KAJ to have that

appeal be transferred to the Connecticut District Court if the Rule 8003 motion is granted and the

government prevails in the appeal – *i.e.*, if the underlying adversary proceeding is transferred back to

the Connecticut Bankruptcy Court.[2/]  As a further "Introduction" to this brief, the United States

restates the descriptive part of the underlying Rule 8003 motion, as follows:

> The bankruptcy case out of which this matter arises was filed and remains
> pending before the Connecticut Bankruptcy Court as its Case No. 98-51923.  The

---

[1/] "Ex." references are to exhibits filed electronically as attachments to the Rule 8003 motion in support of which this brief is filed.  "DI#" refers to the numerical entries on the Bankruptcy Court's docket for Adversary Proceeding No. 01-4065 unless a different case number or court is indicated.  DI#s 1 through 55 were originally entered in Connecticut before the adversary proceeding was transferred to Delaware. All docket item entries after DI# 55 are available through hyperlinks on Pacer.

[2/] No. 03-cv-33-KAJ refers to an appeal from an order of the bankruptcy court entered December 12, 2002 ["12/12/02 Order"].  In early 2003, Judge Jordan ordered that appeal stayed until the Connecticut District Court determines certain appeals by the United States from orders of the bankruptcy court in that district, and he recently entered an order administratively closing No. 03-cv-33-KAJ on the docket subject to reopening when the Connecticut appeals are ruled upon.  Among the government's arguments in No. 03-cv-33-KAJ is that the matter in respect to which the 12/12/02 Order was issued (an application by debtor's counsel for compensation) was beyond the statutory authority of the Connecticut Bankruptcy Court to transfer to Delaware.

1

debtor, Scott Cable, was created pursuant to a Chapter 11 plan of reorganization confirmed by the Delaware Bankruptcy Court in 1996 in the consolidated cases, *In re Ace-Texas, Inc. a/k/a Simmons Communications-Texas, Inc.*, No. 96-166-PJW (Bankr. D.Del.). Pursuant to the 1996 plan, reorganized Scott Cable issued certain securities referred to as junior subordinated secured PIK notes that lie at the center of the instant controversy. (PIK refers to the payment-in-kind interest feature, whereby more notes are issued rather than cash interest payments.) The junior notes now underlie a secured claim in the Connecticut case, which would exhaust the remaining proceeds (about $40 million with accumulated interest) of a court-ordered sale in 1999 of all of Scott Cable's assets, which would leave nothing to pay about $60 million in federal and state gains taxes (including interest) incurred in the sale.

The United States commenced the instant adversary proceeding under Part VII of the Federal Rules of Bankruptcy Procedure, contending that the junior notes, although debt in form, are, in substance, equity, and therefore may not be paid until administrative tax claims are satisfied. (DI# 7 (amended complaint).) In the alternative (count II), the government seeks to have the secured claim for the notes be equitably subordinated, pursuant to 11 U.S.C. § 510(c), to administrative taxes.

As described in greater detail below, the Connecticut Bankruptcy Court, after being reversed on appeal on an initial ruling that the 1996 confirmation order barred the government's adversary complaint, transferred venue for the adversary proceeding to Delaware on the premise that it should be determined by the Hon. Peter J. Walsh, because Judge Walsh confirmed the 1996 *Ace-Texas* plan. The United States maintains that this transfer was improper. It sought interlocutory appeal in Connecticut, which was denied. In order to preserve its ability to appeal the transfer within this district and circuit, cf. Nascone v. Spudnuts, Inc., 735 F.2d 763, 766 (3d Cir.1984), the United States promptly moved for re-transfer, which was denied by Judge Walsh.

In early 2006, the government moved that Judge Walsh recuse himself, which prompted him to have the case be reassigned (although he stated that he found the motion meritless, while acknowledging that an appellate court might disagree).[3] The United States then moved again to re-transfer venue back to Connecticut, arguing that Judge Walsh's reassignment removed the sole reason for the transfer here in the first place, and that venue should be transferred back to Connecticut for that and additional reasons, including but not limited to the unavailability of several important witnesses who are within the subpoena range of the Connecticut court, but not the Delaware court, and the fact that the defendants are currently seeking a ruling that would overturn the law of the case created by the appellate decision of the Connecticut District Court, making it more appropriate that any appeals from a final judgment in the adversary proceeding be to that Court rather than to the Delaware District Court.

---

[3] As the United States has informed the bankruptcy court in responding to certain allegations about the recusal motion that are not presently important, the recusal motion had to be approved by the Assistant Attorney General in charge of the Tax Division, Department of Justice, and was thoroughly reviewed at several levels.

It is from the denial of the recent motion for re-transfer that the United States now seeks leave to appeal, and seeks to have this appeal be adjudicated before the trial goes forward.  Since the trial is currently set for the three consecutive weeks beginning June 12, 2006, we are requesting expedited determination of this motion, and expedited determination of the appeal if the motion is granted.  As the June trial date approaches, if this appeal is not determined, we will likely file a motion to stay the trial unless the Bankruptcy Court agrees to stay the trial pending this appeal.  The United States maintains that if the trial goes forward in Delaware and it suffers an adverse judgment on the merits, the entire case will have to be retried in Connecticut because the transfer here in 2001 was reversible error, the denial of the transfer back to Connecticut in 2001 was reversible error, and/or the denial of the transfer back to Connecticut in 2006 was reversible error.  Furthermore, the United States' trial strategy will have been disclosed in the meantime (not to mention the waste of resources of a three-week trial).

**Request to Assume Pendent Jurisdiction**

At the same time, we ask that the District Court exercise pendent jurisdiction over the 2001 orders transferring the case in the first place and initially denying retransfer.  Pendent appellate jurisdiction permits an appellate court, in its discretion, to exercise jurisdiction over issues that are not independently appealable, but that are nonetheless intertwined with issues over which appellate court properly exercises its jurisdiction.  In re Kaiser Group, Int'l, Inc., 307 B.R. 449, 458 (D.Del. 2004) (bankruptcy appeal).  If this Court reviews the 2006 denial of re-transfer, it should not require the United States to wait until there is a final appealable judgment in the adversary proceeding to seek review of the 2001 transfer order, followed by the denial of re-transfer.  Those rulings are partially intertwined with the 2006 denial of re-transfer.

The remainder of this submission follows the format directed by Bankruptcy Rule 8003(a).

**Rule 8003(a)(1):**

**Statement of the Facts Necessary to an Understanding
of the Questions to be Presented by the Appeal**

*The 1996 Case – Genesis of the Issue on the Merits*

The debtor, reorganized Scott Cable, was created pursuant to a Chapter 11 plan of reorganization confirmed by the Delaware Bankruptcy Court in 1996 in *In re Ace-Texas, Inc. a/k/a Simmons*

3

*Communications-Texas, Inc.*, *et al.,* No. 96-166-PJW (Bankr. D. Del.). Class 6 in the 1996 plan

consisted of the unsecured claims of public bond holders. Class 7 consisted of the unsecured claims of

the holders of certain subordinated PIK notes ["unsecured junior notes"]. The unsecured junior notes

had been issued in a non-bankruptcy restructuring in 1993 in exchange for notes previously issued as

part of a highly leveraged buy-out in 1988 of the companies that became the 1996 debtors.

The 1996 plan involved a refinancing of all secured debt while paying all unsecured claims in

cash except for classes 6 and 7 (the pre-1996 public bond holders and the pre-1996 junior note

holders). The public bond holders (class 6) received a cash payment of past-due interest and

exchanged their bonds at principal face value for new senior subordinated secured PIK notes (with PIK

interest at 15% per annum). They received an additional benefit noted in a moment. The junior note

holders (class 7) exchanged their unsecured pre-1996 subordinated PIK notes for junior secured

subordinated PIK notes (with PIK interest at 16% per annum) equal to the face value of their pre-1996

notes with past-accrued PIK interest, except that 15% of these new junior secured PIK notes were

issued instead to the public bond holders as an extra payment to obtain their consent to the scheme.[4/]

Of the new secured junior notes, the 85% issued to the pre-1996 junior note holders were called

"Series A" and the 15% issued to the pre-1996 public bond holders were called "Series B." Neither

group of claimants gave new cash or other property to the debtor. Furthermore (and this was not

disclosed to the Bankruptcy Court in the 1996 case), the debtor's management was given a 21.5%

stake in any recovery on the Series A junior notes (*i.e.*, from the 85% of the secured junior

---

[4/] Except for characterizations of intent, the facts recited in this fact statement are undisputed and, unless another evidentiary source is noted, merely describe the transactions specified in the plan in the 1996 case or carried out on the record in the 1998 case pursuant to court orders. Many of the facts recited herein are the subject of published decisions by either the Delaware or Connecticut Bankruptcy Court or by the Connecticut District Court.

subordinated PIK notes received by the pre-1996 unsecured junior note holders).[5]

An alternative Chapter 7 liquidation analysis attached as an exhibit to the final version of the disclosure statement in the 1996 case (filed 11/1/96) revealed that if the assets had been sold at that time in a liquidation, the debtor would have incurred over $43 million in gains taxes, the payment of which would have had priority over the public bonds and the junior notes, with the result that the junior note holders would have recovered nothing and the public bond holders would have realized 34 cents on the dollar for their bonds.  This is partly because the "basis" in the company's assets had been adjusted downwards over the years due to deductions for depreciation that were larger than actual reduction in value, while some of the tax-depreciated assets actually appreciated in value.

Due to certain other provisions in the *Ace-Texas* plan pertaining to corporate governance and control, the details of which are not important for present purposes, the defendants (including the debtor) expected that the assets of reorganized Scott Cable would be sold within three years of confirmation, at which point the new security interests were supposed to entitle the senior and junior subordinated PIK note holders to be paid ahead of the tax that they expected would be incurred on the sale of assets.

### *The Pre-Appeal Proceedings in Connecticut in the 1998 Case*

In late 1998, reorganized Scott Cable filed a pre-packaged plan of liquidation under Chapter 11 in the District of Connecticut, Bridgeport Division.  *In re Scott Cable Communications, Inc.*, Case No.

---

[5] Not only was the management's 21.5% stake not disclosed, but also debtor's counsel stated at the confirmation hearing (*transcript of 12/6/96 hearing* at p.7) that all management compensation was set forth in an agreement attached to the disclosure statement, but the agreement attached thereto was a management fee agreement and it did not include any reference to a separate "Management Incentive Agreement" that granted the management a shared 21.5% stake in any recovery on the junior notes.  Also, management held a right to a smaller portion (sliding scale percentages) of any recovery on the pre-1996 unsecured junior notes under a prior management incentive agreement.  *Armstrong Dep*. at 128-29, 317-18.  This pre-existing conflict of interest also was not disclosed on the record during the 1996 case.  (We are not submitting depositions or other evidentiary materials with this motion for leave to appeal, but will reply with any proof necessary if defendants' responses seek to refute any facts cited.)

98-51923 (Bankr. Conn.). The plan would have enabled the payment of the secured junior notes without paying an administrative gains tax on a sale of the debtor's assets. The Connecticut Bankruptcy Court sustained the government's objection to confirmation of a Chapter 11 plan, finding its purpose was "tax avoidance" in violation of 11 U.S.C. § 1129(d). In re Scott Cable Communications, Inc., 227 B.R. 596 (Bankr. Conn. 1998).

All of the debtor's assets were sold in early 1999 pursuant to 11 U.S.C. § 363, for about $165 million, and about $35 million was placed in escrow after paying all senior secured creditors. This included full payment of the secured senior subordinated PIK notes that the pre-1996 public bond holders received in the face amount of their public bonds along with their PIK interest from 1996 to 1998 (at 15% per annum). The sale resulted in administrative income tax claims exceeding $45 million and now totaling well over $60 million with interest (not counting penalties), including about $50 million federal tax with interest, and over $10 million in similar tax claims due to eleven states.

Meanwhile, in December 1998, the United States filed, with the Connecticut Bankruptcy Court, the complaint commencing this "adversary proceeding" under part VII of the Federal Rules of Bankruptcy Procedure. Count I claims that the junior subordinated PIK notes, while debt in form, are equity in substance, and thus are not entitled to a distribution in the current Chapter 11 case in Connecticut until administrative claims, including administrative taxes incurred in the sale, are paid. In the alternative, Count II claims that the secured claim for the junior notes should be equitably subordinated to administrative tax claims, pursuant to 11 U.S.C. § 510(c). The only original defendant was the indenture trustee for the junior notes, since it filed the secured claim on behalf of the junior note holders. (DI# 7 (amended complaint).)

In response to the complaint, the indenture trustee immediately moved for summary judgment arguing that the order confirming the 1996 plan barred the government's claims. The debtor was permitted limited intervention for the purpose of supporting summary judgment. The Connecticut

6

Bankruptcy Court granted summary judgment in April 1999, but the United States appealed and the Connecticut District Court reversed in early 2001. United States v. State Street Bank and Trust, 259 B.R. 536 (D.Conn. 2001) (reversing United States v. State Street Bank and Trust, 232 B.R. 558 (Bankr. Conn. 1999)).

### The Transfer Without a Motion, the Reasons Therefor, and the First Motion to Re-Transfer

At a May 8, 2001 hearing in the Connecticut Bankruptcy Court, just after the District Court's reversal of the *res judicata* ruling, Judge Shiff indicated that he thought the adversary proceeding belonged before Judge Walsh in Delaware, based on his involvement in the confirmation of the plan in *Ace-Texas*.[6] He asked the parties to determine their positions and held a telephonic conference on May 14, 2001, at which the government objected and the court indicated it would entertain a motion from the debtor, but debtor's counsel did not accept the invitation to make such a motion.[7] On May 22, 2001, the Connecticut Bankruptcy Court issued an order to show cause in the main Chapter 11 case why the case should not be transferred to Delaware so that it could be determined by Judge Walsh, citing the May 8, 2001 hearing. The United States filed a memorandum in response, arguing that the requirements of 28 U.S.C. § 1412 were not met, that a motion was essential to transfer, that Judge Walsh's involvement was a reason *not* to transfer the case to Delaware rather than a reason to do so, see Codex Corp. v. Milgo Electronic Corp., 553 F.2d 735, 739 (1st Cir. 1977), and that if the case was transferred, recusal of Judge Walsh might ultimately be required. (Conn. Bankr. Case No. 98-51923, DI# 303.) On June 7, 2001, the Connecticut Bankruptcy Court issued an ORDER TRANSFERRING ADVERSARY PROCEEDING TO THE DISTRICT OF DELAWARE. (DI# 52.) The order is

---

[6] Judge Shiff stated at the May 8, 2001 hearing that "it seems to me the appropriate thing for me to do, rather than really second guess Judge Walsh, is to change the venue of this case . . . ." *Transcript* of 5/8/01 hearing, p.29. This transcript was re-filed as either DI# 50 or 51 in the Delaware adversary proceeding (both entries refer to hearings on that date).

[7] See DI# 57 at p.7. The May 14, 2001 tele-conference in Connecticut was not recorded. This citation is to a 2001 pleading in Delaware, describing it as it is described in text above.

published.  In re Scott Cable Comm., Inc., 263 B.R. 6 (Bankr. Conn. 2001).

In the transfer order, the Connecticut Bankruptcy Court revealed its view that the issues in this adversary proceeding boiled down to the interpretation of the 1996 plan and/or what Judge Walsh would have done if the IRS had objected to its confirmation in 1996 (263 B.R. at 9):

> The issue of whether the IRS is the holder of a claim superior to that of the Jr. PIKS only arises as a matter of interpretation of the effect of the Delaware Plan, of which the IRS had inadequate notice. *See In re Scott, supra*, 259 B.R. 536 at 545 (D.Conn. 2001), appeal pending. That issue arose here only because the IRS did not object to the confirmation of that plan and because Reorganized Scott filed a second chapter 11 petition in this district. That question is best answered by the Delaware bankruptcy court which approved the Delaware Plan. As Reorganized Scott and the IRS conceded on May 8, 2001, any resolution of this adversary proceeding will require an examination of the Delaware record. See Dkt. # 51, transcript at 18-19, 21. The Delaware bankruptcy court is therefore the appropriate forum to determine what it would have done had the IRS objected to confirmation of the Delaware Plan.

The United States maintains that the transfer order misconstrued the nature of the government's claims in this case, which do not boil down to a reexamination of the issues in the 1996 confirmation proceeding, although we agree that they may entail rejection of certain findings included in the 1996 confirmation order endorsed by Judge Walsh.  The government's adversary complaint includes two counts.  The first claims that certain instruments issued pursuant to the 1996 plan, in the form of debt, are, in substance, equity, and thus are not entitled to a distribution in the current Chapter 11 case in Connecticut until administrative claims, including a $40 million-plus administrative federal tax claim, are paid.  This debt/equity recharacterization issue is fact-intensive, involving the application of 23 factors under the case law to the facts in analyzing whether the notes at issue are, in substance, equity notwithstanding that they are, in form, debt.

The second count seeks equitable subordination of the defendants' claims vis-a-vis the administrative tax claims, pursuant to 11 U.S.C. § 510(c).  In short, the government maintains that the defendants used the 1996 bankruptcy to obtain a security interest for their previously unsecured claims, without providing the company with additional new cash or other new assets in exchange, for

8

the specific purpose of positioning them to be paid ahead of gains taxes that defendants expected the

company to incur in a future sale of all its assets, when they knew that there was a substantial risk that

there would be insufficient proceeds to pay the taxes if the new secured junior notes were paid first.

Further, debtor's management was given a 21.5% stake in any recovery on the new secured notes, thus

eliminating the debtor's incentive to resist granting the security interest.  And, the public bond holders

were given 15% of the new secured junior notes, on top of new secured senior subordinated notes

equal to the face amount of their bonds, thus in effect buying their cooperation in the scheme.

While the government's equitable subordination theory would undermine some of the findings

and/or conclusions set forth in the 1996 confirmation order, the government maintains that it is not

required to prove that the *principal* purpose of the 1996 plan was tax avoidance.  Rather, it is sufficient

for the government to prove that the grant of the security interest that leapfrogged defendants' claims

over a future tax (one that they anticipated would be incurred) was either the result of inequitable

conduct or produced a grossly inequitable result.[8/]  See In re Submicron Systems Corp., 432 F.3d 448,

462 (3d Cir. 2006).

The 2001 transfer order did not analyze any of the traditional factors that are considered under

the case law pertaining to venue transfers, such as where parties and witnesses are, economical estate

administration, applicability of local law, etc.  (See argument below.)

The United States filed a motion for interlocutory appeal of the 6/7/01 transfer order, pursuant

to Bankruptcy Rule 8003, and that motion was denied at a hearing held by the Connecticut District

Court (Thompson, J.)  At that hearing, Judge Thompson recognized that the transfer order reflected

---

[8/] At the same time, while the government maintains it is not necessary for it to establish fraud, it maintains that the grant of the security interest embedded in the 1996 plan reflected what amounts to a fraud on the United States.  (Assertions of attorney-client privilege by the defendants in discovery were overruled based on the crime-fraud exception to the attorney-client privilege (DI# 225, 233).)

"Judge Shiff's assumption that Judge Walsh could take the case."[9/]  The United States soon thereafter

moved the Delaware Bankruptcy Court to re-transfer the adversary proceeding back to Connecticut.

(DI#57.)  This was required to preserve the government's ability to raise the issue in any appeal from a

final appealable order within this district.  Judge Walsh denied the re-transfer motion.  (DI# 66.)

Notwithstanding the denial of the re-transfer motion in 2001, Judge Walsh commented at the

hearing that "having the case here strikes me as presenting somewhat of an anomaly because the

alternative relief  requested in the adversary proceeding is subordination under Section 510(c), and it

just strikes me as strange that the court that is not presiding over the chapter [11] case would make a

determination for subordination under Section 510(c)."  *Transcript of 12/19/01 hearing*  (DI# 69) at

15.  Judge Walsh went on to explain that he would nevertheless deny re-transfer because the district

court in Connecticut, in denying the government's motion for interlocutory appeal from the transfer

order, had "basically said that Judge Shiff did not abuse his discretion in transferring the case" and, "in

that context, it would seem highly inappropriate for me to send the case back to Connecticut because

it, in effect, would be saying to Judge Shiff that I didn't agree with what he did nor did I agree with the

District Court, what the District Court did on appeal." Id.

### *Judge Shiff's Misinterpretation of Judge Walsh's Order Granting the Debtor's Motion to Intervene, Causing Denial of the Appointment of a Disinterested Trustee Who May Waive the Debtor's Attorney-Client Privilege*

In 2002, Judge Walsh granted a motion by the debtor to intervene in the adversary proceeding

on the indenture trustee's side, even thought it is thus litigating against the objective pecuniary

interests of the bankruptcy estate for which it is supposed to be a fiduciary.  United States v. State St.

Bank and Trust Co., 2002 WL 417013 (Bankr. Del. 2002).  The debtor claims a duty to "defend its

---

[9/] The transcript of the Connecticut District Court's hearing, held on August 31, 2001, is on file in the Delaware adversary proceeding as DI# 57.  The portion quoted in the text above is found at pages 42-43.

capital structure" (notwithstanding that it is naught but a bank account with no intention of reorganizing), see id. at *3, and "a right to intervene on the Note Holders' behalf and attempt to ensure that they receive the benefit of their bargain." Id. at *4. The United States maintains that, as the estate's fiduciary, it is the debtor-in-possession's duty to challenge secured claims and liens against its estate where reasonable bases to do so exist.[10/] The United States maintains that, objectively, the reason the debtor chose to help defend the secured claim for the junior notes is that debtor's management will earn a 21.5% commission for any recovery on the Series A secured junior notes and thus have $8 million to gain personally from helping uphold the claim.[11/]

Following the debtor's intervention, the holders of the Series A junior notes (the 85% of them that were issued to the pre-1996 junior note holders) were granted intervention. They are defendants Allstate Insurance Co., Media/Communications Partners, L.P., Chestnut Street Partners, Inc., Milk Street Partners, Inc., and TA Investors (collectively the "note holder defendants").

In 2002, the government renewed an earlier motion in the main Chapter 11 case before the Connecticut Bankruptcy Court to convert it to Chapter 7. Among various other arguments for conversion (e.g., inability to confirm a plan), the government argued that the debtor's management was subject to a conflict of interest due to the 21.5% stake in the junior notes, and had improperly caused the debtor to take the side of the note holders in their fight with the government. On July 18, 2002,

---

[10/] A trustee or debtor-in-possession has a fiduciary duty to all creditors, but its primary duty is to unsecured creditors. In re JLM, Inc., 210 B.R. 19, 25-26 (B.A.P. 2d Cir. 1997); In re Lundborg, 110 B.R. 106, 109 (Bankr. D.Conn. 1990). See also In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991). A trustee or debtor in possession represents the secured creditors only in his capacity as a custodian of the property upon which they have a lien. In re Nadler, 8 B.R. 330, 333 (Bankr. E.D.Pa. 1980). The Code provides trustees with the duty to object to claims that are subject to reasonable objection, and to avoid security interests where possible. See 11 U.S.C. §§ 704(5), 510(c), 544(b). A debtor in possession has the same responsibilities. 11 U.S.C. § 1107(a).

[11/] The management incentive agreement accords the 21.5% commission formally to a management company. That company is, in turn, owned by the debtor's present and former principals, including in large part by its present C.E.O., Bruce Armstrong.

Judge Shiff denied conversion, and simultaneously (in the same order) overruled a government objection to a cash collateral stipulation under which the indenture trustee agreed that the alleged collateral for the junior notes – *i.e.,* the remaining sale proceeds in escrow – could be used to defray the debtor's litigation expenses in the Delaware adversary proceeding, including attorneys fees.  In the 7/18/02 order, Judge Shiff held that Judge Walsh's order allowing the debtor to intervene in the adversary proceeding was law of the case and barred the government both from opposing payment of the debtor's counsel and from seeking conversion because Judge Walsh's order was "not subject to collateral review."[12]  The bizarreness of this situation was revealed when, at the outset of an October 1, 2003 hearing in the Delaware proceeding, Judge Walsh spontaneously indicated he could not understand why the case had not been converted to Chapter 7, thus confirming that his ruling granting the debtor's motion to intervene was not intended to preclude such conversion.  (DI# 233 at 4, 6.)

### Genesis of the Overlapping Delaware and Connecticut Appeals

The United States appealed the July 2002 order to the Connecticut District Court.  Debtor and the indenture trustee moved to dismiss the appeal as interlocutory and the government cross-moved for leave for interlocutory appeal if the order was not otherwise appealable.  Judge Thompson of the District Court did not rule on the motion to dismiss and cross motion for leave to appeal until March of 2005, as discussed further below.[13]

During the adversary proceeding, appeal No. 03-cv-33-KAJ in the Delaware District Court, and another Connecticut appeal with overlapping issues, arose as follows.  At the tail end of the venue-transfer order, Judge Shiff included a transfer of future applications by debtors' counsel for fees for services in the adversary proceeding.  When an interim fee application was filed, the government

---

[12] Conn. Case No. 98-51923, DI# 377.  The Connecticut case filings are available through hyperlinks on Pacer and, thus, this Court may readily take judicial notice of them.

[13] The pending appeal in Connecticut from the denial of conversion could impact the transfer issue in this appeal for reasons indicated in the argument below.

objected. One of the grounds for objection was that, even assuming the transfer of the adversary complaint was proper, the transfer of the fee applications was beyond the statutory authority of the bankruptcy court and void. The United States also argued that the court could not grant compensation to debtors' counsel for taking a position objectively against the pecuniary interests of the bankruptcy estate because fees may only be paid for services that could at least possibly benefit the estate. Meanwhile a similar fee application was filed in Connecticut for services outside of the adversary proceeding and the government objected on a similar basis (without the jurisdictional issue). On December 12, 2002, the Delaware Bankruptcy Court granted an interim fees award and assumed jurisdiction to order a disbursement of funds from the estate in Connecticut. It also denied a stay (except it granted one long enough for the government to seek one from this Court). On December 23, 2002, the Connecticut Bankruptcy Court granted an interim fees award and stayed it pending a similar appeal in Connecticut. Once again Judge Shiff ruled that the government's objection was barred by the law of the case created by Judge Walsh's 3/3/02 order permitting the debtor to intervene. The government sought leave to appeal in both districts, pursuant to Bankruptcy Rule 8003, arguing in the alternative that orders were appealable collateral orders.[14]

The government sought a stay of the Delaware Bankruptcy Court's 12/12/02 order from both the Delaware District Court and the Connecticut District Court (arguing that the latter had power to stay distributions from the estate in Connecticut under Bankruptcy Rule 8005 and 28 U.S.C. § 1334(e)). During a telephonic hearing on January 29, 2003, Judge Jordan of this Court noted, in extending a temporary stay of Judge Walsh's order allowing interim fees to be paid, that he was somewhat concerned about one impact of the transfer of fee applications -- that being the placement of

---

[14] The government's pending appeals from all three Connecticut rulings (the denial of conversion, overruling objection to the cash collateral stipulation, and the fees award) include an argument that rulings in the Delaware adversary proceeding are not "law of the case" applicable in separate contested matters in Connecticut that raise different claims or objections, and that the narrower doctrine of "issue preclusion" should not apply to an interlocutory ruling.

the same legal issues in front of two district courts in two separate appeals, that could result in conflicting rulings in the same bankruptcy case.[15/]  At a subsequent hearing on February 21, 2003, Judge Jordan stayed the motion for interlocutory appeal until the appeals in the Connecticut District Court were concluded, stating that he felt that the Connecticut District Court had a paramount interest, since the main bankruptcy case was in Connecticut, and that he would be inclined to defer to judgments rendered by that Court on those issues which are presented in both appeals.[16/]

Meanwhile, the Connecticut District Court, by order of February 7, 2003, granted leave to take an interlocutory appeal from Judge Shiff's 12/23/02 order on compensation.  It subsequently deferred briefing that appeal until it could resolve whether the other, earlier appeal (from Judge Shiff's 7/18/02 order) would go forward and whether the appeals would be consolidated.  Unfortunately, the Connecticut District Court took quite long to reach the various pending motions (to dismiss the appeal as interlocutory and the cross-motion for leave to take an interlocutory appeal), but ultimately, on March 14, 2005, it denied dismissal of the appeal from the denial of conversion and granted leave to appeal the cash collateral ruling and the subsequent fees award.  In addition, Judge Thompson stayed *all* distributions (including any to comply with Judge Walsh's distribution order), and consolidated the fees appeal with the earlier appeal from the grant of the cash collateral stipulation and the denial of the government's motion to convert.  In allowing the Connecticut appeals to proceed, Judge Thompson stated that management of the debtor had a "conflict of interest" based on their stake in a recovery on the junior notes, adding that "[i]t is not apparent to me how any reasonable person could rely on the management of the debtor to undertake an objective evaluation of the issues." *Transcript of 3/14/05*

---

[15/] For reasons indicated in the argument below,  the United States believes that a similar problem is implicated by the denial of transfer.

[16/] Judge Jordan further requested that the parties convey his views in this regard to the Connecticut District Court, which was done by filing a copy of the hearing transcript in the appeals in the Connecticut District Court as part of a motion regarding the record and briefing schedule.

14

*hearing* at 4.  (This transcript was filed in No. 03-cv-33-KAJ on 3/15/2005.)

The Connecticut appeals were soon thereafter briefed.  Unfortunately, although Judge Thompson had indicated on March 14, 2005, that he wanted to determine the merits before beginning a large criminal re-trial in September, and "while it's so fresh in my mind if I can," he was not able to do so.  The criminal case re-trial recently ended in a second hung jury, and Judge Thompson then had the criminal case reassigned to another judge for a third trial.  On March 20, 2006, he issued an order for oral argument.  At a telephonic scheduling conference on April 11, 2006, after debtor argued that the conversion issue appeal should be put off so the Delaware trial could supposedly "moot" that appeal, and after the government insisted it was entitled to have a disinterested trustee determine, *prior* to the trial, whether to waive the debtor's attorney-client privilege, Judge Thompson determined to dispense with oral argument and stated he would determine the appeal – at least the conversion issue portion of it – before the adversary trial in Delaware.  He asked government counsel to report back to him on the outcome of a motion in Delaware to postpone the trial that was expected to be determined at a hearing on April 12, 2006.  This information was then conveyed to the Delaware Bankruptcy Court by the filing, on April 11, of a supplement to the government's motion to continue the trial. (DI# 411.)  As noted below, one of the many things ordered at the April 12 hearing in the Delaware Bankruptcy Court was a rescheduling of the trial for three consecutive weeks beginning June 12, 2006.

### Discovery and Summary Judgment Proceedings

Discovery in the adversary proceeding first commenced after the transfer to Delaware.  In 2002, the United States complied with written discovery by the indenture trustee and the debtor, which included the production of a number of memorandums written by IRS attorneys with respect to the initial version of the 1996 plan and disclosure statement filed on August 28, 1996.  These memorandums are discussed further below.

In early 2003, the defendants moved again for summary judgment based on the "finality" of the

plan, arguing that this was distinct from *res judicata* rejected by the Connecticut District Court.  Judge Walsh denied the motion.  See United States v. State Street Bank & Trust, 303 B.R. 35, 41 (Bankr. Del. 2003) (the IRS cannot be bound by the confirmation order under the finality theory "where the IRS can be viewed as a stranger to the first case").

By the fall of 2003, the government had taken the ten fact witness depositions permitted by local rules and discovery was complete, with two reservations.  First, the government had filed a conditional motion to take additional depositions if summary judgment was not granted.[17]  Second, the government had filed a motion to compel production of documents withheld under the attorney-client privilege and had requested certain follow-up discovery in the motion to compel.  In granting the motion to compel, Judge Walsh held that the United States made a prima facie showing that the crime-fraud exception to the privilege applied and ordered most of the disputed documents produced. *Transcript of 10/1/03 hearing* (DI# 233); 10/16/03 Order (DI# 225).  He thereafter granted several limited follow-up depositions, with regard to the documents.[18]

The follow-up depositions were completed in late 2004, after which the United States moved

---

[17]  DI#s 207, 210-216.  The filing of the conditional motion for additional depositions eventually became one of the arguments in support of a different motion by the government to take certain depositions of unavailable witnesses for more limited purposes, which the Bankruptcy Court most recently granted (for the most part) on April 12, 2006.

[18]  The government is arguing in its pending appeal in Connecticut from the denial of conversion to Chapter 7 that a disinterested Chapter 7 trustee would waive the privilege in the best interests of the estate, and that this could lead to additional reasons to have the adversary proceeding be tried in Connecticut.  While the order overruling debtor's objection to producing certain documents based on the crime-fraud exception to the privilege partially ameliorated the lack of a disinterested trustee , it did not eliminate the problem.  If a trustee were to waive the privilege, the United States would gain unrestricted access to *all* of the records of the debtor's former attorneys in New York City (within 100 miles of the court in Bridgeport, Connecticut).  Additionally, several witnesses asserted the privilege as a basis to refuse to answer questions during their depositions, including the debtor's principal and chief executive officer, Bruce Armstrong, Mr. Armstrong's predecessor, Steven Simmons, and one of the debtor's attorneys, Michael Blumenthal.  Simmons and Blumenthal are not available for a trial in Delaware, but are within the subpoena range of the court in Bridgeport, Connecticut.  Armstrong will supposedly be available at trial.  If a disinterested trustee waived the privilege, any witness who attends voluntarily or is subject to compulsory process would have to answer all questions at trial.

for summary judgment.  The indenture trustee cross-moved for the same in early 2005.  At a hearing

on July 22, 2005, Judge Walsh denied both motions, and set trial for  May 8, 2006.[19/]  (DI# 318.)

   In his bench ruling denying summary judgment, Judge Walsh made certain comments that

potentially implicate the law of the case established in the 2001 appeal in Connecticut, and that also

became an issue when the government later moved that he recuse himself.  That is, after posing the

question, "Do we have tax planning or tax avoidance here?," Judge Walsh stated:

> The potential substantial tax liability resulting from a sale of the assets should have
> been obvious to everyone and it was not secret.  And, it should have been obvious to
> any reasonably sophisticated person, including IRS lawyers, who read the 1996 plan
> and disclosure statement, that the 1996 plan could, in the future, effect a significant
> change of priority for the note holders, vis-a-vis the IRS.  Yet in its October 6 letter, the
> IRS signed off by stating that the plan was unobjectionable.

(*Transcript of 7/22/05 hearing* (DI# 318) at 3-4.)[20/]  The reference to the "October 6 letter" is to a

Memorandum dated Oct. 6 or 16, 1996, signed by "Sandra M. Jefferson, Senior Attorney, from

District Counsel, Baltimore," to "Ass't Chief Counsel (GL) Attn: Carol A. Campbell," of the Office of

Chief Counsel in Washington, D.C., and is one of two IRS attorney memos that defendants had

introduced into the summary judgment record with their responses to the government's motion.  The

10/96 Jefferson memo references the bar date for claims and states that "We do not intend to file

objections since the Plan is unobjectionable and the IRS has not filed a proof of claim."  The other

---

[19/] Judge Walsh did not issue a written opinion or otherwise resolve several fundamental disputes that
came to light on the substantive law and how the law is applied to both of the government's alternative
claims.

[20/] Tax planning normally refers to lawful efforts to minimize or avoid the imposition of tax, not
transactions designed to evade the collection of a tax that one expects to incur.  We submit that elevating
the priority of the subordinated unsecured notes to secured status, in order to entitle them to payment
before a tax that the defendants and the debtor expected the company to incur in a future sale of all its
assets, without the recipients of the new security interest providing the company with additional new cash
in exchange, and while promising debtor's management a 21.5% stake in any recovery on the new
secured notes, cannot reasonably be postulated as nothing more than innocuous "tax planning."  (None of
the facts just recited were disputed by defendants in opposing summary judgment; they are confirmed by
defendants' own internal documents and the deposition testimony of their representatives.)

memorandum that defendants introduced – dated 9/13/1996 from the GL division's Bankruptcy branch chief to three other divisions within Chief Counsel's office (addressed formally to the "Assistant Chief Counsels" of the three divisions) – reflected that the initial plan and disclosure statement, filed August 28, 1996, had been reviewed by Ms. Jefferson, was sent by her to the national office, and was then distributed to three other divisions for them to review the "future tax consequences" of the plan. From this, defendants have argued that the IRS attorneys had scrutinized the plan for precisely the sort of scheme defendants carried out, and must either have recognized it and decided to do nothing about it or else were "negligent."

Judge Walsh's suggestion that a "potential substantial tax liability resulting from a sale of the assets should have been obvious to everyone . . . including [the] IRS lawyers" (and presumably also including Judge Walsh in 1996) was the first time that the court gave any indication of deviating from what Judge Walsh had earlier characterized on several occasions as the "law of the case" from Judge Thompson's appellate decision.[21] The suggestion also rests on a plain error of fact, given the timing of the IRS memorandum that the court depicted as "sign[ing] off" on the plan as "unobjectionable."[22]

---

[21] For example, at the beginning of the December 19, 2001 hearing on the government's motion for re-transfer, Judge Walsh reassured the government that he viewed as the "law of the case" District Judge Thompson's decision. *Transcript of 12/19/01 hearing* (DI# 67) at 4-5. That decision held that the IRS received the final 1996 disclosure statement and plan, assumed that it reviewed from a "sophisticated" perspective, and held that it did not provide the IRS with sufficient notice that the plan could adversely affect the IRS's interests in the manner now at issue so as to require it to have objected to confirmation.

[22] The plain error of fact is that there is no mention whatsoever in the initial version of the plan and disclosure statement – the only version in existence at the time Ms. Jefferson wrote that the plan was "unobjectionable" – of any possible future sale of assets or of any possible tax that would be incurred in connection with any sale. Judge Walsh was incorrectly associating the September/October 1996 IRS memos in his mind with the *final versions* of the plan and disclosure statement dated October 31, 1996 and "bench-filed" at the November 1, 1996 hearing at which the disclosure statement was then approved, and only thereafter served on the IRS. Unlike the final versions, the initial versions filed on August 28, 1996, did not contain any mention of any possible sale of all the assets within three years, and contained a page stating "To Be Provided" in the place for the eventual alternative liquidation analysis exhibit that, in the final version, contained an estimate of the tax that would be incurred in an alternative liquidation under Chapter 7 (at over $43 million). Judge Thompson's opinion, however, had addressed the final version and nevertheless held that the things Judge Walsh declared "obvious" were likely not to be recognized or understood by the IRS even from the final version of the plan and disclosure statement.

These errors were presumably due, in part, to Judge Walsh's not having considered the government's reply brief reminding the court of the law of the case and explaining the real meaning of the memos that had been newly raised in defendants' response.[23/]

Although Judge Walsh's comments at the July 22, 2005 hearing contributed to the government's later arguments for recusal, the government did not immediately recognize this import and it was not until December of 2005 that the government filed a motion that Judge Walsh recuse himself (DI#s 321, 322). As the government candidly acknowledged in its reply (DI# 325) to defendants' objections to the recusal motion, the United States would likely not have filed the recusal motion but for Judge Walsh's comments at the next (12/5/05) status conference, but, faced with a potential waiver argument, the government realized that the grounds for recusal had grown considerably. Thus, its reply in support of its motion for recusal stated:

> What actually happened is that the government, as the defendants have suggested [citation omitted], probably would never have moved for recusal notwithstanding the appropriateness of such a motion (having already preserved for possible appeal its opposition to transfer and its motion for re-transfer partly on similar grounds), but for the Court's insistence that the government (in the words of the defendants) "fish or cut bait" with respect to trying to preserve one of the arguments underlying its opposition to the transfer of venue in 2001. [Footnote omitted.] In late November 2005, the Court spontaneously invited the parties to inform it whether they would prefer a continuance of the trial date, or reassignment of the case to a judge who could presumably try it as scheduled in May of 2006. The trial attorney handling the *merits* of the government's case notified the Court that either option was acceptable but, perceiving that defendants would later argue that such a statement "waived" the indirect § 455(a) point in support of the government's opposition to venue transfer, included a point preserving that argument and noting that it would be mooted by reassignment to another judge. (DI# 319) Judge Walsh then held a status conference on December 5, 2005, at which he essentially put the government in a position where, unless it made a formal recusal motion, it risked facing a later argument by defendants that it had not only waived formal recusal, but also had waived for appeal the related aspect of its argument against transfer to Delaware in the first place.

---

[23/] Judge Walsh denied a motion to file a reply above the page limit at the same time he denied summary judgment, so it was too late for the government to seek to file a substitute reply within the usual page limit. He acknowledged at the hearing, therefore, that he did not review the government's reply papers (which also included substantial additional evidentiary materials).

Faced with that prospect, the government assigned the undersigned attorney to draft a possible recusal motion for consideration by appropriate officials at the Department of Justice.[Fn11]  As part of that task, the transcript of the July 22, 2005

> [Fn11] Under Department regulations, a motion to recuse a judge may not be filed without the specific approval of the assistant attorney general who heads the relevant litigating division – in this case the Assistant Attorney General of the Tax Division.  This is also why Mr. Shapiro was unable to give an immediate answer when Judge Walsh asked at the December 5th telephone status conference whether the government would file motion after Judge Walsh in no uncertain terms indicated that one should be filed or else the government should unambiguously give up the issue.  But the Court would be incorrect to assume that the recusal motion was not carefully weighed at a number of levels.

hearing on summary judgment was reviewed and it was recognized, with the issue of recusal squarely posed for consideration, that the naked legal issue indicated in 2001 (in opposing transfer and seeking re-transfer) – *i.e.*, that it was wrong to have a judge who was a participant, if unwittingly, in the alleged scheme by the defendants, and who made the 1996 findings, sit in judgment of that scheme and/or review the correctness of his own findings – was now more problematic than when it was then first posed.  The undersigned attorney then also decided to check on Judge Walsh's comments during the 1996 hearings on the disclosure statement and plan to ascertain what, if anything, was "obvious" to Judge Walsh at *that* time.  The undersigned then found that Judge Walsh had stated in 1996 that he had read the disclosures statement and plan and "couldn't figure out" whether the stock in the reorganized debtor would have any pecuniary value.  The undersigned has since found that, in the meantime, the Third Circuit had issued a precedent bearing significantly on the government's original arguments.  Clemmons, supra (and infra).

The partial citation at the end of the above quote is to Clemmons v. Wolfe, 377 F.3d 322 (3d Cir. 2004) (reversing, as "plain error," judge's failure to *sua sponte* recuse himself from hearing habeas petition challenging conviction, where he was the state court judge who presided at the trial 20 years earlier).

The indenture trustee (DI# 324) and the other defendants (DI#s 323) objected to the government's December 2005 recusal motion  (and, as already mentioned, the government replied).  By letter of January 27, 2006, Judge Walsh determined that the case should be reassigned to Judge Carey.  (DI# 328.)  Although Judge Walsh's letter states that he found the government's motion for recusal to be without merit and untimely, it acknowledges that it was conceivable that an appellate court could disagree, and that the issue could easily be eliminated by having the case be reassigned to another judge.  Additionally, Judge Walsh determined that reassignment of the case would enable the

Court to retain the May 8, 2006 trial commencement schedule, which Judge Walsh could not do.[24]

### *The Government's 2006 Re-Transfer Motion*

On February 10, 2006, the United States moved again to transfer the adversary back to

Connecticut. The arguments in the government's 2006 motion for re-transfer included the following:

- The original reason for the transfer of the adversary proceeding from Connecticut, severing it from its moorings in the underlying case, had evaporated.

- The concerns in the recusal motion, while attenuated, are not eliminated. To the extent that another judge may have to "second guess" Judge Walsh, it would better for that judge not to be one from the same district.

- The debtor in this case has its headquarters in Stamford, Connecticut. Scott Cable, 227 B.R. at 598.

- The bankruptcy judge in Connecticut, although not as familiar with the issues as Judge Walsh had become, was the judge next most familiar with the issues.

---

[24] While the details of the recusal motion should not be important for this appeal, the United States maintains that the motion was meritorious, and that the government's reply (DI# 325) to defendant's objections to recusal thoroughly dispelled their argument that the motion was untimely, by demonstrating that the need for recusal was magnified by the denial of summary judgment (making Judge Walsh the trier of fact under a deferential standard of review) and in light of the comments of Judge Walsh at the July 22, 2005 hearing. In addition, while defendants argued that the government should have sought recusal in 2001 when its first re-transfer motion was denied, the Third Circuit had not yet issued its decision in Clemmons, holding that a judge who presided over an independent prior case should not adjudicate a related but different one in which the events in the prior case, including the judge's rulings, are at issue. If this Court becomes concerned about the bases for, or timing of, the motion for recusal, we suggest that it read the recusal motion papers and especially the government's reply brief (DI# 325). We note here the following example of the problems that were newly raised by the court's comments at the 7/22/2005 hearing. If, notwithstanding Judge Thompson's opinion, the government's complaint was going to be approached from the perspective that a possible sale of assets and a large tax resulting from such a sale "should have been obvious to everyone" who read the plan and disclosure statement, and that it should also have been "obvious" to the IRS that the security interest the plan contemplated would elevate the priority of the defendants' claims over such a tax, then by the same token the scheme should arguably have been obvious to the presiding judge in 1996, who indicated at hearings that he had read the plan and disclosure statement and had asked questions about them. Since the court nevertheless issued an explicit finding of fact in the 1996 confirmation order that there was no tax avoidance purpose to the plan, a "reasonable person" might then wonder whether that same fact finder, if permitted to be the trier of fact for the government's complaint for equitable subordination, might have a tendency, at least subconsciously, to find the scheme to be acceptable "tax planning." Another problem stems from the inability at this stage for anyone to be 100% sure that a judge could fully separate what now seems "obvious," with the benefit of briefs and 20/20 hindsight, from what was or was not obvious "to everyone" in 1996. These are only two of several additional concerns indicated in the recusal motion and the reply.

- Lead counsel for the indenture trustee throughout the Delaware adversary proceeding has been the law firm of Shipman & Goodwin in Hartford, Connecticut, which is charging fees against the estate under a separate security interest not dependent upon the security interest for the junior notes. Lead counsel for the debtor, Akin Gump *et al.*, which is also still claiming a right to fees from the estate, even if the government prevails in the adversary proceeding, is in Manhattan, which less than an hour drive from Bridgeport, Connecticut. (Other defendants' lead counsel are from Boston and Washington, D.C., and neither location is significantly less costly or time-consuming to reach.)

- A number of significant witnesses who will not appear voluntarily are located within 100 miles of the courthouse in Bridgeport, Connecticut. These include some who would soon be the subject of a government motion to take trial depositions, due to their unavailability for a trial in Delaware, and in light of the limitations on the number of depositions during discovery. But even if the trial depositions were permitted, there are advantages to having witnesses appear live so that their examination can be tailored to account for testimony of prior witnesses and so that they may be re-called for rebuttal.

- The fact that Judge Walsh bowed out of this adversary proceeding mitigates but does not eliminate the errors the United States maintains inhere in the original transfer to this district, which ultimately could become the basis for a reversal of a final judgment after a trial and an appellate mandate for transfer and a re-trial.

- The fact that the procedural morass caused by the transfer of future fee applications at the tail end of the original transfer order could be undone. And, the District Court could then transfer appeal No. 03-cv-33-KAJ to the Connecticut District Court.

The government's reply brief (DI# 358) contained a very important additional reason in support of transfer due to an issue raised in the defendants' various objections to transfer. Specifically, the defendants' objections (DI#s 335, 336, 337) raised the point that the establishment of significant law of the case favors having a trial be where that law of the case was established. The defendants tried to argue that significant law of the case had been created by Judge Walsh's pre-trial rulings. (*See* DI# 337 at p.17.) First, the government demonstrated this was not so: Judge Walsh had not rendered significant legal rulings; his bench ruling denying summary judgment, determining there existed a triable dispute of fact, contained no legal discussion whatsoever.[25/]

---

[25/] At the hearing on transfer, one of the defendants' attorneys argued that there is no such thing as law of the case at the trial level and that all law of the case is appellate law of the case. Whether technically "law of the case" or not, the government's reply agreed with the point in defendants' written objections to transfer, that even a trial judge's determination of significant legal issues is a factor weighing against subsequent transfer of venue. This is the main interest served by a timeliness requirement.

More importantly, the government pointed out that between the time the re-transfer motion was filed and the time of its reply brief, the parties filed three motions that seriously implicated the appellate law of the case created by Judge Thompson's 2001 decision reversing the *res judicata* ruling, as follows. On February 24, 2006, shortly before the due date for all motions *in limine*, the government filed a motion to exclude from evidence at trial the two IRS attorney memos included in defendants' summary judgment papers. (DI# 338, 339.) On March 1, 2006, defendants, based on those two and several additional IRS attorney memorandums produced in discovery, filed coordinated motions to reopen discovery to take depositions of three IRS attorneys and one non-attorney employee with respect to their involvement with 1996 plan. (DI#s 341, 348, 350.) Also on March 1, 2006, defendants filed a motion to compel production of a withheld IRS attorney draft memo (one never sent to anyone and recently found on a word processor). (DI# 342.) In their 3/1/2006 discovery motions, and in their 3/15/2006 responses to the government's motion to exclude the IRS attorney memos (DI#s 363, 371, 372), defendants made strident accusations that all of the memos had been deliberately concealed from Judge Thompson in the Connecticut appeal filed in 1999 and decided in 2001 on the *res judicata* issue. Defendants further argued that, even if the memos were not deliberately concealed, they constituted newly discovered evidence of the type that justified jettisoning the law of the case established in Judge Thompson's decision. Alternatively, they argued that the IRS attorney memos and testimony that the IRS witnesses might provide would be relevant even if the appellate decision was not disturbed.

The government filed a combined response to the discovery motions (DI# 374) that included six sworn declarations, including from all four witnesses the defendants asked to depose, a fifth one from the government's former trial attorney from the Department of Justice who argued the 1999-2001 appeal, and a sixth one from a Connecticut IRS attorney who was responsible for retrieving IRS files requested by the Department of Justice. Using the declarations, the government argued in its

combined reply brief that the national office review of the 1996 plan's "future tax consequences" referred to whether transactions that would definitely be carried out pursuant to the plan could lead to incorrect reporting of taxes on future tax returns of the debtor or third parties.  The purpose of this review, according to the declarations, was to determine whether it would be appropriate for IRS counsel to advise the IRS of issues that might be examined in any audits of such future tax returns. The declarations state that this review was independent of the determination that the plan was "unobjectionable," which was based instead on the lack of a prepetition tax claim, the debtors' postpetition compliance with tax laws, and the plan's provision that any administrative taxes that might conceivably yet be incurred would be paid in full.  Also using the declarations, the government argued that there was no concealing of documents.  Rather the early summary judgment motion was filed immediately in response to the complaint without any document retrieval or discovery.  The government lost and the case was over absent reversal, and the arguments for reversal could not be based on new facts.  It was not until after reversal of grant of summary judgment and remand, and the receipt of a discovery request for documents in 2002, that Justice Department asked the IRS to search its files, whereupon it learned of IRS attorney memos (and then produced them to defendants).

While the discovery motions and motion to exclude the IRS memos were pending, the government filed its reply to the objections to re-transfer of venue, arguing that any decisions on the three motions just described should be appealable in Connecticut, where local practice directs all appeals in a bankruptcy case to the same district judge that heard any prior appeals in that case.

In opposing re-transfer (DI#s 335, 336, 337), defendants raised a number of additional arguments, and their counsel raised some vituperative collateral accusations, which the government's reply (DI# 358) also refuted.  These included (1) the accusation by defendants' counsel that the government "sandbagged" Judge Walsh by not disclosing in its recusal motion that it would seek transfer if Judge Walsh removed himself from the matter (the reply thoroughly refutes this accusation);

24

(2) the accusation by defendants' counsel that the sole purpose of the transfer motion was to delay the trial for no apparent reason (the reply refutes this and demonstrates that defendants are responsible for why it has taken this long for the adversary proceeding to reach near-readiness for trial); (3) the argument that trial could still go forward on May 8, 2006, while transfer would substantially delay it (the reply argues that May 8 had already become unrealistic and there was no reason to expect major delay in Connecticut); (4) the argument that the burden is now on the government to demonstrate the appropriateness of transfer (the government argues that consideration must be given to the fact that the case should never have been transferred here in the first place); and (6) the argument that the re-transfer motion was untimely in view of law of the case that had developed (this is discussed above).  In connection with the last point, regarding concerns about law of the case, the government argued that defendants' recent discovery motions, filed between the government's re-transfer motion and the defendants' objections thereto, added new impetus for re-transfer, by raising the specter of having the courts in this district determine the extent to which any newly discovered evidence may be grounds to reconsider the Connecticut District Court's appellate decision or may otherwise remain relevant in the face of that decision.

### 3/29/06 Bench Ruling; 4/10/06 Order

The Delaware Bankruptcy Court held a hearing on March 29, 2006, at which it heard oral argument from all parties, and then provided the following bench decision (reproduced here in full):

> THE COURT:  All right.  On consideration of the motion and all the written submissions and argument today, I'm prepared to rule on the government's motion to retransfer this adversary matter, and I think that it's not all that unusual, but the matter's been well argued, and I don't think either party left a stone unturned.  So, in terms of the completeness of the arguments and the record, I think you have about as good a record as I could have.  For the reasons that follow, I intend to deny the motion.  Here's why: I look at the factors provided by the Third Circuit in its decision Jamar Evers (phonetical) vs. State Farm, it's reported at 55 F.3rd, 873, relied upon by the Delaware Bankruptcy Court in its Heckinger decision reported at 296 Bankruptcy Reporter 323.  Other decisions, like PWS Holding reported at 1998 Bankruptcy Lexis 549, and Safety-Kleen, 2001 Bankruptcy Lexis 1296, the Enron

decision which the parties discussed in their papers, all pretty much agree on what the factors are. Now, the four main factors that most courts talk about are - that courts should consider are proximity of the court to interested parties, location of the debtor's assets, efficient and economic administration of the estate, and the relative economic harm to the debtor and other interested parties. The parties here focused largely on the efficient and economic administration of the estate. The Third Circuit in its Jamar decision expanded those really to twelve factors. And in running through those, I look at them this way: Number one, the court should consider the plaintiff's choice of forum. That here weighs in favor of the plaintiff, the movant. But most of the other factors are either of no applicability to this situation or weigh in favor of the defendants. The defendants have indicated that this is their for[u]m of preference. The claim arose - well, it arose here basically coming out of what the government claims was an improperly, among other things, confirmed plan. No one's argued about the location of books and records or anything of that nature. The defendants say it's more convenient for them here. Frankly, I don't see it as inconvenient for the plaintiff to be here. There's a possible issue with respect to convenience of the witnesses or availability of the witnesses, but there may be some way for the Court to ameliorate that. I won't consider that until the next round of arguments on the various pretrial motions. Other factors, like enforce ability of the judgment, public policies of the fora, familiarity of the judge with applicable state law, local interest in deciding local controversies, I don't think those are really factors here. Despite the argument that the plaintiff makes here about the law of the case, I don't view that as something of really any weight in favor of the plaintiff here. When I come down to practical considerations that would make the trial easy, expeditious, or inexpensive, or the relative administrative difficulty in the two fora regarding the respective court's dockets, I think that weighs in favor of trying the case here. So, for all of those reasons, I am going to deny the motion.

*Transcript of 3/29/06 hearing* (Ex.3 to Rule 8003 motion) at pp. 68-71.

In addition, before announcing his bench decision, certain matters were indicated during argument that are appropriate to note. First, during the argument, Judge Carey indicated that he thought a significant factor ought to be "how expeditiously the transferee court would be able to get to trial, and that burden rests on the movant here," noting the government's previous objection (at an earlier hearing) to having Judge Carey call Judge Shiff to inquire. *Ibid.* at 24-25. In response, while reserving its argument that this should not be a consideration, and also arguing that the trial should in any event be stayed pending the conclusion of the Connecticut appeal from the denial of conversion to Chapter 7, government counsel added: "but to the extent the Court disagrees with those two things and

it's going to make whether or not the Connecticut Court can finish a factor, then I suppose we'd be willing to work with opposing counsel on coming up with some kind of a query, that's a joint query, on the record as opposed to a phone call, some kind of inquiry to Judge Schiff." *Ibid*. at 25.  As a somewhat related point, and presumably underlying the bench ruling's point that "there might be some way to ameliorate" the problem with witnesses, Judge Carey indicated he was considering presiding over video depositions. *Ibid*. at 58-59.  So informed, government counsel, mindful that Judge Carey had just indicated his view of the importance of the concern that the Connecticut court might not have time to try the case in the near future, suggested that perhaps Judge Carey could preside over a trial by video in Connecticut as a visiting judge (noting that a district court judge in Boston had done this in a tax trial in New York). *Ibid*. at 60.

When government counsel had argued that the burden of persuasion should not be the same as an original transfer motion in light of the evaporation of the reason for the transfer out of Connecticut in the first place, and instead the motion should be viewed in part as one to reconsider the original transfer in light of new developments, Judge Carey indicated that he disagreed with that view because "[t]hat decision was made and then upheld on appeal, and I will not consider it in that vein." *Ibid*. at 61.  *See also ibid*. at 61-62 ("you carry the burden").  (Technically, the transfer was not "upheld on appeal," but rather leave to take an interlocutory appeal was denied.)

Judge Carey also indicated that he was not giving credence to allegations of ill motive on the part of the government in the motion to transfer venue. *Ibid*. at 56.  And, he indicated that he did not view the government as having waived the transfer argument by not including it with the motion for recusal. *Ibid*. at 32-33.

### *4/12/06 Rulings on Other Pretrial Motions*

Since one of the government's arguments for re-transfer was that any appeals from rulings on the motions implicating the law of the case from Connecticut District Court's decision should be

appealable to that Court, Judge Carey's rulings on those motions may bear on this appeal. Those motions were heard on April 12, 2006. Judge Carey formally "granted" the government's motion to exclude the IRS attorney memorandums, but clarified that the ruling was because the memos *alone* did not, in his view, establish the connection or inferences that defendants sought to have the Court find. In this regard, Judge Carey ruled that the defendants should have access to IRS attorney witnesses for the purposes of questioning them regarding the documents and thus attempting to establish facts that would be relevant to an equitable subordination claim, notwithstanding Judge Thompson's ruling that the information in the final disclosure statement and plan in 1996 was insufficient to give notice that the IRS's pecuniary interests could be implicated in the manner that is now raised by the instant adversary proceeding. After polling the parties on which IRS witnesses might be useful for the purpose indicated, the Court ultimately directed the United States to make two IRS attorneys (Sandra Jefferson and Kathryn Zuba) available for defendants' counsel to examine at trial, and allowed a deposition of a third IRS lawyer (Carol Campbell).[26/] Also, while denying a deposition of a retired non-lawyer IRS employee who was involved with the 1996 case (Elizabeth Hennessey), the Court would not preclude service of a trial subpoena on her, indicating any motion to quash would have to be considered if and when that came to pass.

The Court addressed another motion at the April 12, 2006 hearing that might have some bearing on the transfer issue. The Court granted, for the most part, a motion by the government to take limited additional depositions of unavailable witnesses in order to obtain foundational evidence for certain documents and related information submitted in declaration form with its summary judgment papers, including of a couple of witnesses who would be within the subpoena range of the court in Bridgeport, Connecticut.

---

[26/] A transcript of the 4/12/06 hearing has been ordered but not yet received.

Finally, at the April 12, 2006 hearing, the Court rescheduled the trial for the three consecutive weeks beginning June 12, 2006 (after hearing that one defendant's counsel had a conflict in July and another had one in August, and that August was also not good for the government).  In connection with this, Judge Carey indicated that he had received and read the government's April 11, 2006 filing (DI# 411) describing that day's telephonic conference with Judge Thompson in the Connecticut appeals, in which Judge Thompson stated that he would rule on the government's appeal from the denial of conversion to Chapter 7 before the commencement of the trial in Delaware.  The government has since filed a motion with the Connecticut District Court, asking it to render a decision sufficiently in advance of trial to allow time for a trustee to be appointed on remand, and for a trustee to make a reasoned determination of whether to waive the debtor's attorney-client privilege.  (The government submits that the appointment of a trustee in Connecticut would further confirm, if not significantly magnify, the error in the failure to re-transfer the case there.)

## Rule 8003(a)(2):

## Questions to Be Presented by the Appeal and Relief Sought

The question to be presented by the appeal is whether the bankruptcy abused its discretion in denying re-transfer of venue to Connecticut, including but not limited by making any or all of the following errors:

(1)     rejecting the relevance of any error in the original transfer order and placing the burden on the government to show that the law favored transfer, as if the case originated in Delaware;

(2)     completely rejecting as a reason supporting transfer the fact that its decisions on the relevance of the IRS attorney memos and any testimony by IRS attorneys should be appealable (by either side) to the Connecticut District Court, given the degree to which such decisions will necessarily implicate the interpretation of a decision of that Court, or seek to have that decision be reconsidered;

(3)     not considering the extent to which the divided jurisdiction has led to confusion over the application of law of the case and to other procedural irregularities and difficult procedural issues and overlapping appeals;

(4)     relying on a non-bankruptcy venue analysis and thus ignoring the well-established preference for proceedings arising within a bankruptcy case to be venued where the case is venued;

(5)     treating the fact that the prior bankruptcy case took place in Delaware as a relevant factor when the court's files are readily authenticated in any other district, and none of the witnesses are in Delaware, and no local law is implicated;

(6)     placing too little emphasis on the proximity of certain parties and unavailable witnesses to the bankruptcy court in Connecticut; and/or

(7)     placing too much emphasis on expediency or avoiding delay of the trial that it presumed would result from a transfer, allowing that factor to outweigh all others?

The relief sought is the reversal of the denial of transfer and remand with instructions to transfer the adversary proceeding back to the Connecticut Bankruptcy Court, followed by this Court's transfer of No. 03-cv-33-KAJ to the District Court in Connecticut.

**Rule 8003(a)(3):**

**Statement of the Reasons Why Appeal Should be Granted**

## I.     PREFACE:  CONFLICTING LEGAL STANDARDS FOR DETERMINING WHETHER TO GRANT INTERLOCUTORY APPEAL, PARTICULARLY AS APPLIED TO VENUE DETERMINATIONS

A dispute over the test for interlocutory appeal under 28 U.S.C. § 158(a)(3) and Rule 8003 arose in the appeals now pending before the Connecticut District Court, so we address that issue first here.  Debtor argued that the test is that set forth in 28 U.S.C. § 1292(b) for discretionary review of district court decisions by the courts of appeals.  Under that test, (1) the order must involve a controlling issue of law, (2) as to which there is substantial ground for difference of opinion, and (3) appeal may materially advance the termination of the litigation.

While there are no doubt many cases -- particularly older cases -- that state (with little analysis) that § 1292(b) standards govern, and while those standards may deserve some consideration, it is simply wrong to incorporate restrictions into § 158(a)(3) that Congress rejected.  For one thing, district courts exercise plenary authority over bankruptcy cases, retaining the power to refer cases to, and to

30

withdraw them from, the bankruptcy courts. See 28 U.S.C. § 157(d). In that connection, it is unlikely that Congress intended to limit district courts' power to hear interlocutory appeals. It should also be noted that bankruptcy courts are units of the district court, 28 U.S.C. § 152, and that bankruptcy judges are not appointed under Article III.[27/]

A modern trend thus recognizes that district courts have much broader discretion to grant interlocutory appeal under § 158(a)(3) than is provided under § 1292(b). E.g., In re Moix-McNutt, 215 B.R. 405, 408 n.6 (B.A.P. 8th Cir. 1997) ("[g]iven our broad discretion over interlocutory orders, we are not constrained to follow the standards established for the courts of appeals"); Mishkin v. Ageloff, 220 B.R. 784, 790-91 (S.D.N.Y. 1998) (endorsing a more flexible approach to granting interlocutory appeals under § 158(a)(3)); In re Orange Boat Sales, 239 B.R. 471, 474 (S.D.N.Y. 1999) (same).

In his February 7, 2003 order granting interlocutory appeal from the Connecticut fees order, Judge Thompson held that, while his decision was informed by the § 1292(b) standards, "rigid adherence to the § 1292(b) standard is not appropriate in this case," and concluded that "exceptional circumstances' warranted interlocutory review. (Conn. Dist. Ct. No. 3:03-cv-357-AWT, DI# 8.) On March 14, 2005, when granting leave to appeal the cash collateral order, Judge Thompson stated, "[a]s I concluded in deciding to grant leave to appeal in case number 3:03CV357, I believe that this case and the related case arise out of a unique set of circumstances, which have led to the creation of an

---

[27/] Section 216 of Senate Bill 2266 in 1978 would have made all "final decisions and interlocutory orders of the bankruptcy court" automatically appealable to Article III judges of the district court. See also S.Rep. 95-989, supra, at 154-55. The House's rejection of that approach, in favor of delegating the judicial power to Article I bankruptcy judges, contributed to the Constitutional defect found by the Supreme Court in the famous Northern Pipeline decision. Northern Pipeline Constr. Co. v. Marathon Pipeline Co., 458 U.S. 50 (1982). The jurisdictional provisions were then revamped in 1984, giving district judges unrestricted discretionary authority to hear appeals from interlocutory orders by the Article I bankruptcy judges. The United States submits that this is part of what makes the grant of authority to Article I bankruptcy judges constitutional, just as there must be available meaningful review by district judges of all rulings by magistrate judges. The theory that all review by an Article III judge could be deferred until a final judgment in a major piece of litigation would overlook the reality that review of many rulings becomes pragmatically more difficult once too much water has gone under the bridge. Thus, district judges were given discretion to accelerate review of very important pretrial rulings.

unusual set of issues." *Transcript* at 4-5 (copy filed 3/15/05 in No. 03-cv-33-KAJ).

Other courts borrowing in part from § 1292(b) "have also reasoned that discretion under section 158(a)(3) is greater than that afforded under section 1292(b)." In re Jackson Brook Institute, Inc., 227 B.R. 569, 580-82 (D.Mass. 1998). *See Note, Jurisprudence and Jurisdiction: Toward a More Flexible Approach to Bankruptcy Interlocutory Appeals*, 67 Fordham L. Rev. 3261 (1999) (arguing that a more flexible approach than § 1292(b) is warranted for interlocutory appeals under § 158(a)(3)). See also In re Donald, 328 B.R. 192, 198 (9th Cir. BAP 2005) (granting interlocutory appeal over transfer of venue for bankruptcy case without discussing standards).

Moreover, in In re Steele Cattle, Inc., 101 B.R. 263 (D.Kan.1988), the court, quoting the preeminent bankruptcy treatise (*Collier on Bankruptcy*), held that interlocutory appeal of an order changing venue should be more readily heard in a title 11 case since there is only a "very small chance of success" on an appeal taken after the case is over, in light of the resources that will already have been committed in administering the estate. Id. at 265. Accord In re Landmark Capital Co., 20 B.R. 220, 222-223 (S.D.N.Y. 1982); In re Land, 215 B.R. 398, 402 (8th Cir. BAP 1997) (same reasoning applied to order denying change of venue). While the foregoing cases involved orders granting or denying transfer of the bankruptcy "case," rather than an adversary proceeding, the reasoning applies in the instant circumstances for two reasons. First, unless the government prevails in its pending appeal from denial of conversion to Chapter 7, in the end, almost the entire administration of the estate in the *Scott Cable* bankruptcy case will have revolved around this adversary proceeding. Second, the trial that is expected in this case will be an expensive, time-consuming trial entailing a huge commitment of judicial resources, and both this Court and the Third Circuit may be most reluctant to require a "do over" at the end of the case. This pragmatic reality is precisely what the court in Steele Cattle was referring to when it referred to the "small chances of success" on appeal if appeal is deferred until the entire bankruptcy estate is administered. See also Matter of Trim Lean Meat

Products, Inc., 11 B.R. 1010, 1011 n.1 (D.Del. 1981) (granting interlocutory appeal, under the

forerunner of 28 U.S.C. § 158(a)(3), from the denial of dismissal or transfer of venue of an adversary

proceeding); In re Armbrust, 274 B.R. 461, 464 (W.D.Ky 2001) (asserting discretion to grant leave to

appeal an interlocutory order transferring venue, and observing that no interest was served by delaying

review in light of the discrete issue that could be resolved without addressing the merits of the

controversy); Donald, supra.

　　　　Nevertheless, out of abundance of caution, we demonstrate below that the government in fact

meets the § 1292(b) standards, but we then add other reasons why the District Court should grant

interlocutory review even if the § 1292(b) standards are not strictly met.

## II.　　INTERLOCUTORY APPEAL IS WARRANTED EVEN UNDER § 1292(b) STANDARDS

### A.　Controlling Issue

　　　　The venue issue is a controlling issue in the sense that, if the transfer to this district was

reversible error and/or if the denial of re-transfer was reversible error, then any final judgment in favor

of the defendants will have to be reversed on appeal.  We submit that the original transfer was

reversible error because getting the case before Judge Walsh was not a proper basis for transfer under

28 U.S.C. § 1412 or the case law thereunder.  The re-transfer motion in 2001 was the appropriate

procedure for preserving within this circuit the argument that the original transfer was error – it was

not to be judged as if the case had originated here.  Similarly, the re-transfer motion in 2006 was, in

substance, a motion to reconsider the denial of re-transfer in 2001, based on changed circumstances –

viz, the fact that Judge Walsh would not be presiding after all.[28]  But the 2006 re-transfer motion was

---

[28] In this regard, to the extent Judge Shiff's original transfer order constitutes "law of the case"
establishing the appropriateness of transfer, changed circumstances made it appropriate for Judge Carey
to reconsider Judge Shiff's ruling in light of the fact that the entire purpose of the transfer – to have Judge
Walsh preside – had evaporated.  In addition, the District Court in Delaware is plainly not bound by
Judge Shiff's opinion.  Cf. Nascone, 735 F.2d at 773 n.9 (observing that even assuming transferee district
court was required to follow ruling of transferor district court, transferee circuit court, being at a higher

enhanced by the additional issues that had arisen in the meantime, such as the unavailability of certain witnesses, and the fact that defendants are now raising arguments for revisiting the issues determined by the Connecticut District Court's appellate decision, the final resolution of which has recently been deferred until trial.

The Second Circuit has "acknowledged the availability of review of a non-bankruptcy transfer order under 28 U.S.C. § 1292(b) when 'it is urged that the court considered improper factors in making its decision to transfer.'"  SongByrd, Inv. v. Estate of Grossman, 206 F.3d 172, 177 n. 5 (2000) (quoting Red Bull Assocs. v. Best Western Int'l, Inc., 862 F.2d 963, 965 n. 4 (2d Cir.1988)).   The United States alleges that an improper factor was relied upon to transfer the instant adversary proceeding here in the first place – the presumption that Judge Walsh was the most appropriate trier of fact when just the opposite was the case.

The United States also maintains (as it argued in Connecticut in opposing transfer) that the Connecticut Bankruptcy Court exceeded its authority by *sua sponte* transferring the adversary proceeding here.  In this regard, the Connecticut Bankruptcy Court cited Bankruptcy Rule 1014(a)(1) in support of the transfer.  But that rule explicitly requires a "motion of a party in interest."  And, the Advisory Committee Note to the promulgation of the rule unmistakably spells out that this was intended to mean, unlike a prior rule, that "[t]here is no provision for the court to act on its own initiative."[29/]   The original transfer order court also cited In re Henderson, 197 B.R. 147 (Bankr. N.D. Ala. 1996), as supposed authority for transferring venue pursuant to 11 U.S.C. § 105, but Henderson in

---

level, was free to rule differently).  It should be recalled in this connection that the ruling of Judge Thompson in 2001 was merely one denying a motion for leave to take an interlocutory appeal from the Connecticut Bankruptcy Court's transfer order.  It was not an appellate affirmance of the transfer (putting aside for the moment that, even if it had been an affirmance, changed circumstances would justify reconsideration of the ruling by the Delaware bankruptcy and district courts now).

[29/] That the rules would remove authority for transfers on a courts own initiative should not be surprising, given that venue objections, unlike jurisdiction, are subject to waiver.

fact rejects that theory.  Id. at 152.  (Henderson held that a court could nevertheless *sua sponte* transfer a case under Rule 1014(a)(**2**), which applies only where a case was brought in an *improper* district.)

Similarly, Rule 7087, which governs transfers of an adversary proceeding (as opposed to the case), also requires a "motion" to sever an adversary proceeding from the venue in which the case is pending and transfer it elsewhere.  See Bill's Dollar Stores, Inc. v. New Orleans Printing Service, Inc., 200 B.R. 18, 19 (Bankr. Del. 1994) ("A request to transfer the venue of an adversary is made by motion"); Allegheny Health, Educ. & Research Foundation v. Williams, 233 B.R. 671, 683 (Bankr. W.D.Pa. 1999) (requiring the parties to satsify the "motion requirements" of Rule 7087); Musken, Inc. v. Strippit, Inc., 158 B.R. 478, 484 (BAP 9th Cir. 1983) (Rule 7087 requires that a party in interest bring a timely motion for transfer of venue).

Further, the multiple errors inherent in the original transfer were improperly treated as irrelevant by placing the burden on the United States, in moving for re-transfer in 2006, to show affirmatively that the factors in a traditional venue analysis favor transfer back to Connecticut.  Judge Carey ruled that the original transfer "decision was made and then upheld on appeal, and I will not consider it in that vein." *Transcript of 3/29/06 hearing* (Ex.3 to Rule 8003 motion) at 61.  Preliminarily, the original transfer technically was not upheld on appeal – rather a motion for interlocutory appeal was denied.  But given the wording of Judge Thompson's bench decision denying leave to appeal the transfer, it is understandable that both Judges Walsh and Carey would be reluctant to go against it.  Judge Walsh even commented at the very first hearing following transfer that, although he did not really understand why the case was sent here, it would not be appropriate, in light of Judge Thompson's statement that it was not an abuse of discretion, for Judge Walsh, as a trial-level judge, to reject Judge Thompson's ruling and send the case back.

But this Court is of a coordinate level with the Connecticut District Court and is clearly free and obligated to make its own determination of whether the original transfer was proper and, even if it

was arguably proper, whether changed circumstances dictate that it is time to send the case back. That alone is a unique reason to grant interlocutory review now, rather than waiting to make that determination after resources have been expended on a three-week trial.

Judge Carey also dismissed as irrelevant an important factor that should have been considered. In his bench ruling, he stated that "[d]espite the argument that the plaintiff makes here about the law of the case, I don't view that as something of really any weight in favor of the plaintiff here." The United States maintains that this was error. It overlooks the essence of why courts consider venue motions "untimely" after much litigation in a case. Among the interests served by a timeliness requirement are (1) the interest in avoiding a situation where transfer follows either significant development of law the case at even the trial level, but particularly where there has been an appeal, or (2) the related interest in not enabling a party to escape a judge who has begun to rule against it in important pretrial matters. See In re New York Trap Rock Corp., 158 B.R. 574 (S.D.N.Y. 1993) (denial of request to transfer venue of adversary proceeding warranted on forum shopping grounds). We are not asserting that there was forum shopping at the time of the transfer in 2001. But there was substantial law of the case.[30]

## B.  Substantial Grounds for Difference of Opinion

There is clearly substantial ground for a difference of opinion on the venue issue here, and on several unusual if not unique sub-issues within that determination. In Codex Corp. v. Milgo Electronic Corp., 553 F.2d 735, 739  (1st Cir. 1977), the First Circuit reversed an order staying a Massachusetts declaratory action by the alleged infringer of a patent while denying an injunction against the

---

[30] In arguing against re-transfer, defendants themselves raised the concern about preserving law of the case, arguing that Judge Walsh's denial of summary judgment was significant law of the case making the government's re-transfer motion untimely.  (See DI# 337 at p.17.)  In fact, denial of summary judgment, at least where (as here), it did not contain any discussion of applicable law, does not create any law of the case.  The government's re-transfer motion was not untimely because it was grounded on reconsidering the 2001 denial of re-transfer based on a new circumstance that had only just arisen – Judge Walsh having bowed out of the proceeding.  And, it cannot possibly be said that the government's re-transfer motion reflected dissatisfaction with rulings by Judge Carey, since the re-transfer motion was filed before Judge Carey had made a single ruling.

continuation of a patent infringement action in Kansas brought against the customer of the

Massachusetts manufacturer.  It observed (id. at 739):

> While a judge who has already found a patent valid as against one defendant may not
> be disqualified from reconsidering the issue against another, *Denis v. Perfect Parts,
> Inc., D.Mass.*, 1956, 142 F.Supp. 263, (a case about which the writer has since had
> doubts), if he is the fact finder, and the factual issues are the same, it may be difficult
> for the district judge to give, or to feel he is giving, a new defendant a de novo,
> impartial consideration. See discussion in *O'Shea v. United States*, 1 Cir., 1974, 491
> F.2d 774, at 778-79, and cases cited.

In addition, the government observed in opposing transfer that Judge Walsh might ultimately have to

recuse himself.

    While the recusal issue is not directly before this Court, the government maintains that Judge

Walsh *was* ultimately required to recuse himself, notwithstanding the assertion in his letter that the

recusal motion was without merit, thus ultimately proving the government's original opposition to

transfer to have been correct.  At the same time, when re-transfer was initially denied in 2001, the

possible need to seek recusal was not as clear as it later became in 2005.  The court had indicated at

the first Delaware hearing in 2001 that the law of the case would preclude this proceeding from turning

on any alleged "failure" by the IRS to object to the 1996 plan after examining the plan and disclosure

statement.  Once the court signaled, at the 7/22/2005 hearing, the potential opening of that issue, on

which defendants not surprisingly jumped and piled on,[31/] Judge Walsh could no longer be the trier of

fact consistent with 28 U.S.C. § 455(a) or (b)(1).   See footnote 24 supra.  Furthermore, the Third

Circuit's 2004 decision in Clemmons had also, in the meantime, revealed the government's concerns

in 2001 as appropriate.  In this proceeding, although the government maintains that, to justify equitable

---

[31/] As Judge Carey observed at the 4/12/06 hearing (transcript on order), numerous of defendants' briefs
have countless times repeated and emphasized (using boldface type) Judge Walsh's 7/22/05 statement
that certain things should have been "obvious" to the IRS in 1996 from the disclosure statement and
plan.  The government has, in turn, had to repeat countless times in responses to all those briefs that Judge
Walsh had acknowledged not having read the government's reply.  (Judge Carey suggested both sides
should cease the repetition in this regard.)

subordination under 11 U.S.C. § 510(c), it need only show "inequitable" conduct or even just a grossly inequitable result, we are nevertheless essentially accusing the defendants of a civil conspiracy in the nature of fraudulent avoidance of tax collection.[32/]  While there is no need to address whether there was sufficient *mens rea* to charge a crime here, there could be no doubt that if a case similar to this was brought as a criminal prosecution under 18 U.S.C. § 371, the bankruptcy judge who presided over the case in which the alleged conspiracy was carried out, and on whose endorsement of the confirmation order it depended, could not, if appointed as a district judge in the meantime, preside over the criminal trial.  Cf. Clemmons.  The fact that only civil fraud is alleged does not eliminate the concern. Accordingly, the government's objection to transfer in 2001 was correct, and its motion for re-transfer that followed should have been granted.  In 2006, the government effectively moved to reconsider the 2001 denial of retransfer in light of changed circumstances.  Whether those changed circumstances are attributed to the need for Judge Walsh's recusal, thus vindicating the government's original arguments, or instead are viewed as reflecting his reassignment for a different reason, the fact remains that the changed circumstances justified reconsidering re-transfer and, at least this time, granting it.

Reasonable minds may also differ on the correctness of the refusal by Judge Carey to view the government's motion as seeking reconsideration of a transfer order that either was erroneously issued in the first place or that changed circumstances had undermined.  As the Third Circuit has held in Nascone v. Spudnuts, Inc., 735 F.2d 763, 766 (3d Cir.1984), a party who unsuccessfully objects to transfer preserves the right to appeal that order by moving for re-transfer in the transferee court.  Thus the government's 2001 motion preserved its right to appeal the denial of transfer.  If that approach is to be given real effect, the party cannot be saddled with a burden it did not have in opposing transfer

---

[32/] As the statement of facts indicates, the bankruptcy court has held that the crime-fraud exception to the attorney-client privilege applied here.  Indeed, the government has internal documents from some of the defendants revealing that they specifically discussed and planned to leapfrog the priority of their claim over a future gains tax that they knew was all but inevitable and which they knew would likely leave nothing or not enough to repay their investment, if the tax had to be paid first.

within the transferor court.  Cf. Carteret Sav. Bank, F.A. v. Shushan, 919 F.2d 225, 228 (3rd Cir. 1990)

(observing, in ruling that transferor court's order was not appealable, that "it appears that the Court of

Appeals for the Fifth Circuit will entertain an appeal from the transfer order at the end of the case in

the district court" to which the case was being transferred).[33]

Quite apart from any issues respecting whether a different standard applies to re-transfer versus

original transfer, the United States maintains that Judge Carey's bench opinion reflects several errors

in applying traditional factors determining venue issues.  First, Judge Carey gave no consideration to

the "strong presumption of maintaining venue [in an adversary proceeding] where the bankruptcy case

is pending."  In re Continental Airlines, Inc., 133 B.R. 585, 587 (Bankr. Del. 1991).  "[T]he district in

which the underlying bankruptcy case is pending is presumed to be the appropriate district for hearing

and determining a proceeding in bankruptcy."  In re Manville Forest Products Corp., 896 F.2d 1384,

1390-91 (2nd Cir. 1990).  Cf. Bank of America v. Nickele, 1998 WL 181827 (E.D. Pa. 1998) ("[w]e

are most reluctant to allow pieces to be severed from a case . . . rather than the desired goal of

'centering' administration of an entire case in one jurisdiction," quoting In re 1606 New Hampshire

Ave. Assoc., 85 B.R. 298, 305 (Bankr. E.D.Pa. 1988)).

Instead, Judge Carey relied foremost on a Third Circuit decision in a non-bankruptcy context,

Jumara vs. State Farm, 55 F.3rd 873 (3d Cir. 199_), adding that Jumara was relied upon once before

by the Delaware Bankruptcy Court, citing In re Hechinger Inv. Co., 296 B.R. 323 (Bankr. Del. 2003).

Jumara is not the appropriate framework for a transfer of a bankruptcy adversary proceeding.  It

involved a forum selection clause in a contract and, once the Third Circuit determined that the federal

district court erred in determining that the matter had to be heard by a state court, it invoked a 28

U.S.C. § 1404(a) evaluation for the transfer of a district court action to another district court that was

---

[33] Cateret Sav. Bank went on to grant a writ of mandamus due to special circumstances not material
here.

within the county specified in the contractual forum selection cause, holding that this agreement outweighed the other traditional venue criteria.[34]

The problem with reliance on a non-bankrutpcy precedent is that it completely overlooks the interest in consolidating litigation arising in or related to a bankruptcy case in the same district as the underlying bankruptcy case. As Judge Walsh observed in the <u>Hechinger</u> case, before citing <u>Jumara</u>, "[a]s a general rule, in a proceeding arising under title 11 or arising in or related to a case under title 11, venue is proper in the district where the bankruptcy case is pending." 296 B.R. at 325. But it is more than a rule of where venue is "proper"; it is a rule of where venue is *preferred* for bankruptcy matters.

Second, Judge Carey gave undue weight to the fact that the "claim arose - well, it arose here basically coming out of what the government claims was an improperly, among other things, confirmed plan." (Ex.3 at 70.) Preliminarily, this ignores that original venue for the adversary proceeding would have been improper in this district, given that the bankruptcy case is in

---

[34] At the same time, <u>Jumara</u> recognized that a "plaintiff's choice of venue should not be lightly disturbed." <u>Id</u>. at 879. Here, the government is the plaintiff and it brought this adversary proceeding in Connecticut and opposed transfer from the start. <u>Jumara</u> added that "courts have have considered many variants of the private and public interests protected by the language of § 1404(a)," list those interests respectively as follows (<u>id</u>. at 879-80):

> The private interests have included: plaintiff's forum preference as manifested in the original choice, 1A PT. 2 MOORE'S ¶ 0.345[5], at 4363; the defendant's preference, 15 Wright, Miller & Cooper § 3848, at 385; whether the claim arose elsewhere, *id*. § 3848; the convenience of the parties as indicated by their relative physical and financial condition, id. § 3849, at 408; the convenience of the witnesses--but only to the extent that the witnesses may actually be unavailable for trial in one of the fora, *id*. § 3851, at 420-22; and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum), *id*. § 3853.

> The public interests have included: the enforceability of the judgment, 1A PT. 2 MOORE'S ¶ 0.345[5], at 4367; practical considerations that could make the trial easy, expeditious, or inexpensive, id.; the relative administrative difficulty in the two fora resulting from court congestion, id., at 4373; 15 Wright, Miller & Cooper § 3854; the local interest in deciding local controversies at home, 1A Pt. 2 Moore's ¶ 0.345[5], at 4374; the public policies of the fora, see 15 Wright, Miller & Cooper § 3854; and the familiarity of the trial judge with the applicable state law in diversity cases, *id*.

Connecticut.[35/]  The venue provision for adversary proceedings, 28 U.S.C. § 1409, does not focus

particularly on where a claim arose.  More fundamentally, venue determinations normally consider the

location where a claim arose not because of some abstract principle but because of a pragmatic

recognition that venue transfers often occur early in a case, often before discovery.  In that regard,

where events have occurred usually portends where witnesses will be found, where available

documents may be subpoenaed, and what state's law might apply.  In the instant situation, because the

scheme was perpetrated through a bankruptcy reorganization, all of the documents on file with this

Court are subject to self-authentication no matter where in the country this case is tried, by the simple

expedient of obtaining certified copies from the clerk of the bankruptcy court.  Cf. Hechinger, 296

B.R. at 326 ("[t]he fact that Defendant was invoiced in Houston is not, by itself, sufficient to warrant

transferring venue").  The pre-bankruptcy planning and even the post-petition negotiations did not take

place in Delaware.  There is, as Judge Carey acknowledged, no issue regarding state law.  And, none

of the participants in the scheme reside in Delaware.

    To the contrary, some important witnesses are within the subpoena range of the court in

Bridgeport, Connecticut, including the debtor's former principal (Steven Simmons),[36/] its former chief

financial officer (John Flanagan, Jr.),[37/] and its former lawyers – at least those who participated in the

scheme (Stanley Bloch and Michael Blumenthal and other attorneys who worked with them in the

---

[35/] Under 28 U.S.C. § 1409, proceedings "arising under title 11" (which refers to causes of action *created* by the Bankruptcy Code), as opposed to proceedings "arising in or related to a case under title 11," may **only** be brought in the district in which the case is already pending.  The government's appeal brief in appeal No. 03-cv-33-KAJ contains an extensive discussion of the differences among proceedings arising "under title 11," those arising "in" a case, or those "related to" a case under title 11.  A proceeding for equitable subordination arises "under title 11" – specifically under 11 U.S.C. § 510(c).

[36/] Mr. Simmons was the former chief chief executive officer of Scott Cable, prior to Bruce Armstrong.  He resides in Greenwich, Connecticut.

[37/] Mr. Flanagan lives in Old Tappan, New Jersey (within 100 miles of Bridgeport, Connecticut), and was Senior Vice-President and Chief Financial Officer of the debtor prior to, during, and after the 1996 bankruptcy case.

Baer, Marks & Upham law firm).[38/]   The United States deposed three of the foregoing witnesses

(Simmons, Bloch, and Blumenthal) but would much prefer to examine them at trial – there are

additional questions we would now ask.  The United States did not take the deposition of Mr. Flanagan

only because of a court-imposed limit on the number of depositions, forcing the United States to make

strategic choices about which ones it would depose.  In this regard, the ruling on April 12, 2006,

permitting the government to take limited additional depositions (including of Mr. Flanagan and Mr.

Bloch), while ameliorating the prejudice from the denial of re-transfer, has not eliminated the prejudice

that may be engendered from not being able to call those witnesses to the stand at trial, particularly to

the extent that unexpected issues arise and also for purposes of rebuttal.

As a related error, Judge Carey stated that "No one's argued about the location of books and

records or anything of that nature," but that is not correct.  The government has been arguing now for

years that if the case is converted to Chapter 7, the government will likely gain access to all of the

records of the debtor's former attorneys in New York City because a disinterested trustee should

conclude that waiving the privilege is in the interests of the bankruptcy estate.  If that happens, the

government may have to subpoena witnesses (debtor's former attorneys) to lay the foundation for

and/or explain the import of any documents that the government seeks to use.  These are matters that

could unfold at the last minute, or for which the government may seek to stay the trial without regard

to this appeal.[39/]   By having the case in Delaware, the government may be deprived of the ability to

---

[38/] Messrs. Bloch and Blumenthal work in New York City and were outside counsel for the debtor both
before and during the 1996 bankruptcy case.

[39/] As noted in the fact statement, Judge Thompson has explicitly stated, on the record, an intention to
rule on the conversion appeal before the Delaware trial.  The United States has filed a motion that he also
eliminate the automatic 10-day say if he reverses and instructs the Connecticut Bankruptcy Court to
convert the case to Chapter 7, and has further requested that he retain jurisdiction to stay the trial if
necessary, until a trustee can make a reasoned determination as to whether to waive the attorney-client
privilege.  (Bankruptcy Rule 8005 accords the Connecticut District Court the power to stay the adversary
proceeding in Delaware.)

introduce additional records that, thus far, have not been available to it.[40]

      As discussed under point II-A above, Judge Carey also erred in ignoring that the courts here (the bankruptcy court and the district court in the event of a merits appeal after a final judgment) are likely to become embroiled in disputes regarding the proper application and meaning of the Connecticut District Court's appellate decision.  Even assuming the Delaware Bankruptcy Court ultimately rules at trial that the IRS attorney memos inadmissible, defendants will almost certainly appeal an adverse judgment in light of the sum at stake, and have made it abundantly clear that they will then argue that the "new evidence" justifies jettisoning Judge Thompson's decision.  They may also attempt to revive their argument that the decision should be thrown out because the government defrauded the Connecticut District Court by allegedly concealing documents.  If the defendants do lose and appeal, and make these kinds of arguments, they should be made to the Connecticut District Court. If the defendants somehow succeed in convincing a bankruptcy judge that the IRS should be left holding an empty bag because its predicament was caused by its own ineptitude or "negligence" (as they have repeatedly called it) in not detecting defendants' scheme in 1996, then a government appeal on that issue should similarly be heard by the Connecticut District Court.[41]

---

[40] Defendants have argued that, because Judge Walsh invoked the crime-fraud exception to the privilege, there is nothing left for the government to find.  But the government only moved to compel with respect to a limited number of records and, more importantly, had to make decisions about which documents to include in that motion without the benefit of free access to all of the attorney-client records. Also, as the Court must recognize, often a party's determination of what is not relevant or responsive to a document request and therefore need not even be listed in a privilege log, is a subjective determination and not necessarily 100% correct.  In any event, debtor has steadfastly refused to provide the government with free access to all of its attorneys' records and therefore defendants should not be heard to argue that there is nothing for the government to find.

[41] This raises a concern similar to the one Judge Jordan indicated in staying No. 03-cv-33-KAJ pending the outcome of the appeals in Connecticut.  Judge Jordan expressed concern about inconsistent rulings in two appeals raising some of the same issues.  Here the concern would be that the Delaware District Court may be asked reconsider the decision of the Connecticut District Court and will at least be asked to interpret it and apply it to allegedly relevant new evidence – evidence that the government maintains is irrelevant under the Connecticut District Court's reasoning, because it merely confirms the correctness of the assumption that underlay the decision (that the IRS would not detect the scheme assuming it reviewed the plan documents from the vantage point of a sophisticated creditor).

Judge Carey essentially allowed his belief that transfer would result in delay to override all other considerations. He concluded his bench ruling by stating that "[w]hen I come down to practical considerations that would make the trial easy, expeditious, or inexpensive, or the relative administrative difficulty in the two fora regarding the respective court's dockets, I think that weighs in favor of trying the case here." (Ex.3 at p.70-71.) But the only thing this really speaks to is "expeditious[ness]," because there can be no debate that a trial would be less expensive for the estate in Connecticut. The Indenture Trustee has a security interest for its attorney's fees and its lead law firm is in Connecticut. At the last hearing, for example, two Connecticut attorneys traveled to Delaware. They will be seeking to charge those expenses to the estate, even if the government prevails. Similarly, debtor's lead law firm is in New York City and, while New York counsel appeared by phone at the most recent hearing (having appeared in person before that), it may be assumed that at least one attorney for the debtor from New York City will be traveling to Delaware for a three-week trial. Again, they will be seeking to charge that to the estate, even if the government prevails. This will include travel time, transportation, and hotel bills for multiple attorneys representing the appellees. While the amount may not be exceedingly large in relation to the even larger claims for services during trial time, there can be no dispute that Judge Carey attached overriding weight to a single factor – the desire to have a trial be conducted several months sooner (if that) in a case that has been pending seven years and that will undoubtedly entail one or more appeals.

In sum, there are more than just reasonable grounds for differences of opinion here – there is a compelling case for reversal of the denial of transfer.

### C.  Materially Advance the Termination of the Litigation

There can be no dispute that permitting appeal now may advance the termination of the litigation. That is because, if we are correct on the merits of the venue issue and appeal is not presently permitted, the entire case may have to be re-tried following an appeal from a final judgment

in the adversary proceeding. Defendant's will no doubt argue that transfer will result in delay due to presumed congestion of the Bridgeport, Connecticut docket (which is nowhere proven in the record), but that is not the issue for purposes of whether to grant interlocutory appeal. The issue here is whether an *appeal* now may materially advance the termination of the litigation.

Defendants may argue that merely allowing an appeal will delay a trial. The United States will seek to avoid that by asking the District Court to expedite determining this motion for leave to appeal and, if it is granted to expedite the appeal. While we wish to see the response to this motion before committing, the United States may, if appeal is granted, suggest that the District Court accept this brief as also constituting the government's opening brief on the merits, and similarly treat defendants' response as their answer brief, or shorten the time to file a different answer brief if they wish to do so. The Court may also shorten the government's time to file a reply. But even assuming we find it necessary to seek a stay of the trial so that this appeal may first be concluded, the duration of any such stay need not be unduly lengthy.

Moreover, this adversary proceeding has been pending now for 7½ years and most of that duration is in no way the fault of the United States. A trial will clearly not be the end of the matter, given the sum at stake ($40 million in escrow); rather, a judgment will generate at least one level of appeal if not more. The case should not be tried in the wrong venue to save a couple of additional months before a trial.

## III.  ADDITIONAL FACTORS

As noted, the 28 U.S.C. § 1292(b) test is not the be-all-and-end-all of the exercise of the broader discretion granted under 28 U.S.C. § 158(a)(3). A number of other considerations support granting appeal here.

First, there is a least some irreparable harm the United States will suffer if it is correct on the venue issue, but must await a final judgment to gain review of the denial of venue re-transfer. Apart

from the waste of resources, the United States' trial strategy will have been fully disclosed to defendants' various and numerous attorneys.  As noted in part I above, a number of courts have suggested that interlocutory appeals from venue determinations in bankruptcy cases should be permitted more liberally, precisely in recognition that, pragmatically, inertia will develop against transfer after resources are expended, even if expended in the "wrong" venue.

The problem with the specter of reopening the law of the case from the Connecticut appeal is also deserving of special consideration here.  It raises the specter of the Delaware District Court being asked to second guess the Connecticut District Court, after which the Third Circuit may be asked to review Judge Thompson's 2001 decision and/or resolve any difference between the two district courts.

This is not limited to a situation regarding rulings on the admissibility or relevance of the IRS attorney memorandums or any trial testimony by the IRS attorneys.  Defendants are on record pointing out (correctly) that Judge Thompson's appellate decision, because it resulted in a remand, was an interlocutory non-appealable decision that remains subject to appeal to the circuit level at the end of the adversary proceeding.  Any such appeal should be to the Second Circuit, not the Third.  And, it is Second Circuit law, not Third Circuit law, that ought to govern.

Another way in which the government is suffering uniquely from the transfer of venue to this district lies in the overlap of issues between the two courts and the odd "law of the case" rulings that have emanated from the Connecticut Bankruptcy Court in adhering to non-appealable interlocutory rulings in the Delaware adversary proceeding.  That has resulted in two appeals in Connecticut.

Finally, consideration should also be given to the fact that, if not for the legal remedy of interlocutory appeal under 28 U.S.C. § 158(a)(3), the United States' position here at least comes close to satisfying, if not fully satisfying, the conditions justifying mandamus.  In Nascone v. Spudnuts, Inc., supra, the Third Circuit, addressing non-bankruptcy venue transfer, while holding that a transfer order is not an appealable collateral order, nevertheless determined that "[u]nder the circumstances of this

46

case, we believe that mandamus review is appropriate," citing several factors that bear considerably on

the instant motion for leave to appeal:

> Several factors influence our decision. As a general matter, if the district court
> errs in interpreting contracts said to contain forum selection clauses or seriously errs in
> finding them reasonable, it works a serious hardship on a plaintiff who is then forced to
> take his case to a distant forum. While it is true that plaintiff still has various avenues of
> relief available to him, see supra part I, he is disadvantaged in the meantime and the
> judicial system is compelled to waste significant resources.  Of course, this rationale
> may prove too much, since it provides an argument for appellate review of virtually
> every interlocutory order. Second, therefore, in our consideration of whether mandamus
> review is appropriate, is the extent of the hardship on plaintiff. While modern methods
> of communication and transportation have significantly reduced the burden associated
> with adjudication in a different state, we take judicial notice of the distance between
> Western Pennsylvania and Utah. In real terms, transfer of venue to Utah may deprive
> the plaintiff not only of the forum of his choice, but also of the attorney of his choice.
> Third, we note that transfer based on a forum selection clause in a contract is, unlike
> the myriad factual considerations relevant to the exercise of discretion in a standard
> transfer situation, suffused with legal issues, such as the applicability of the forum
> selection clause and its reasonableness. The appellate court, therefore, may be of
> particular assistance to the district court.

735 F.2d at 773.  The instant venue dispute is also "unlike the myriad factual considerations relevant to

the exercise of discretion in a standard transfer situation" and similarly "suffused with legal issues."

Id.  The transfer here in the first place was based on a nearly unique reason and that nearly unique

reason has since evaporated.  The issue of whether to now shift the burden to the plaintiff in seeking to

get back to its venue of choice, in the wake of the evaporation of the original reason for transfer, is a

unique legal issue that appears to be one of first impression.  While the United States is not complain-

ing of any financial or logistical "burdens" of litigating in Delaware as compared to Connecticut, there

is the matter of unavailable witnesses that limits the government's access to potential additional

evidence not procured during discovery and the ability to react to last minute events (including but not

limited to the possible last-minute appointment of a trustee in Connecticut, who may enable discovery

of additional documents in New York City the foundation for which may only be possible to lay by

calling a witness beyond the Delaware court's subpoena range – a witness who will not voluntarily

appear).

The Ninth Circuit has more pointedly indicated that it will more readily entertain mandamus in respect to venue determinations.  In <u>Pacific Car & Foundry Co. v. Pence</u>, 403 F.2d 949, 952-53 (9th Cir.1968), in granting a writ, the court observed:

> A decision denying change of venue is complete and final in itself. It is not a step toward final judgment on the merits which will merge in such final judgment. Instead, it is collateral to and separable from the rights asserted in the action. Venue provisions deal with rights too important to be denied review. Yet error in denying change of venue cannot be effectively remedied on appeal from final judgment. [Footnote omitted.]  The purpose of the rule is to avoid the disruption, expense, and inconvenience parties and witnesses must suffer by having the trial in an improper forum. To require litigants to await final judgment for relief serves to defeat the very purpose of the venue rule by requiring them to submit to the disadvantages from which the rule is designed to relieve them. Once trial has been completed damages cannot be collected for the extra expense suffered.
>
> This does not mean that review on mandamus is available in all instances since the factors favoring immediate review may be present in varying degrees. While there can be no doubt that there exists the 'naked power' to issue the writ,  [footnote omitted] the power is to be exercised only in the 'sound discretion of the court.' [Footnote omitted.]  The exercise of that 'sound discretion' requires the weighing of numerous factors, including the possible disruption of orderly trial processes as opposed by the hardship and loss of rights that may result from delay of review, [footnote omitted] and the saving of an expensive and protracted trial that leads nowhere but to a complete retrial.

Here there will be a "expensive and protracted trial" that may lead "nowhere but to a complete retrial." In the meantime, the government's trial strategy will have been fully disclosed.

While the "traditional use" of extraordinary writs of mandamus and prohibition "has been to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it has a duty to do so," <u>see</u> <u>Mallard v. United States District Court</u>, 490 U.S. 296, 308 (1989) (quoting <u>Roche v. Evaporated Milk Ass'n</u>, 319 U.S. 21, 26 (1943)), "[m]ore recently the Supreme Court has indicated that a court of appeals may issue a writ of mandamus as part of its advisory or supervisory authority over the district courts." <u>J.H. Cohn & Co. v. American Appraisal Assoc., Inc.</u>, 628 F.2d 994, 997 (7th Cir. 1980).  In that vein, mandamus may lie "to review an 'issue

of first impression' in order to 'settle new and important problems.'" <u>Colonial Times, Inc. v. Gasch</u>,

509 F.2d 517, 525 (D.C. Cir. 1975). The matters underlying the venue determination in the instant

case are novel.

Of course, here the extraordinary writ is unnecessary to entertain (or seek), because the Court

has much broader discretion to grant interlocutory appeal under 28 U.S.C. § 158(a)(3). The only

reason the government is not petitioning for a writ is that a writ is only available where there is no

adequate alternative remedy, and interlocutory appeal is an adequate remedy. The Court should grant

leave to appeal and then expedite its determination of the merits of the appeal. The government's

reply brief will indicate whether the government is prepared to have the Court treat this motion as a

merits brief as well, giving leeway for its differing organizational structure as mandated by Bankruptcy

Rule 8003 (as compared for the format of an appeal brief in Rule 8010).

### Conclusion

The District Court should enter an order granting leave to appeal and ordering the appeal

expedited by whatever means appear appropriate to the Court. If this brief is treated as a merits brief,

the District Court should reverse with instructions to grant the government's motion to transfer venue

back to the District of Connecticut.

/s/ *Peter Sklarew*
PETER SKLAREW
Tax Division, Dept. of Justice
Post Office Box 55
Washington, D.C.  20044
(202) 307-6571 / Fax: 202-307-6571
peter.a.sklarew@usdoj.gov

49

**Certificate of Service**

IT IS HEREBY CERTIFIED that service of the foregoing **BRIEF IN SUPPORT OF UNITED STATES' MOTION THAT DISTRICT COURT GRANT LEAVE TO APPEAL 4/10/06 ORDER DENYING MOTION TO TRANSFER VENUE BACK TO CONNECTICUT IN LIGHT OF RE-ASSIGNMENT OF JUDGE** is being made this  20th  day of April, 2006, upon counsel for all defendants via the Court's ECF system since this motion is being filed electronically.


*/s/ Peter Sklarew*
PETER SKLAREW
Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Washington, D.C.  20044
(202) 307-6571